**FILED**
**HARRISBURG, PA**

MAR 2 4 2008

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MARY E. D'ANDREA, CLERK
Per _____

Randy S. Zimmerman,                      :
          Plaintiff           :        Civil Action
                              :
      v.                      :
                              :
Allen E. Behler, P.E.;                    :
Naomi Wyatt;                             :
Donna Hoskins-Helm;                       :        No. 1:08-CV-538
Sheridan Thompson-Clark;                  :
Debbie Loughman; and                      :        Q. Conner.
Karen Mitchell,                          :
          Defendants           :
                              :
                              :

## COMPLAINT SEEKING DECLARATORY AND INJUNCTIVE RELIEF

### Introductory Statement

1.      This is an action seeking declaratory and injunctive relief on behalf of Randy

Zimmerman, a former employee of the Commonwealth of Pennsylvania, Department of

Transportation against Defendants Allen E. Behler, P.E., Secretary of the Pennsylvania Department

of Transportation; Naomi Wyatt, Secretary of the Office of Administration, Commonwealth of

Pennsylvania ; Donna Hoskins-Helm, Office of Administration SEAP Program Director; Sheridan

Thompson-Clark, SEAP-CCO Program Facilitator; Debbie Loughman, SEAP Coordinator for the

Pennsylvania Department of Transportation; and Karen Mitchell, Director of Human Resources for

the Pennsylvania Department of Transportation. Plaintiff seeks a declaration that the

Commonwealth of Pennsylvania State Employee Assistance Program ("SEAP") is unconstitutional on

its face and as applied for failure to afford procedural due process protections required under the

Fourteenth Amendment to the United States Constitution and, additionally, because in its

application it violates the Americans With Disabilities Act, 42 U.S.C. §12101, et. seq. by requiring medical examinations which are not job-related and consistent with business necessity. Because Plaintiff was separated from his position as a result of a psychological examination as part of a program which was constitutionally infirm and violated federal law, he seeks injunctive relief to restore his liberty and property interest in his employment.

Parties

2.      Plaintiff is Randy Zimmerman, an adult individual residing at 1017 Swarthmore Road, New Cumberland, Cumberland County, Pennsylvania 17070.

3.      Defendant Allen E. Behler, P.E. is an adult individual and the Secretary of the Pennsylvania Department of Transportation with offices in the Keystone Building, 400 North Third Street, Harrisburg, PA 17120.

4.      Defendant Naomi Wyatt is an adult individual and the Secretary of the Office of Administration, Commonwealth of Pennsylvania, with offices at 207 Finance Building, Harrisburg, PA 17120.

5.      Defendant Donna Hoskins-Helm is an adult individual and the Office of Administration SEAP Program Director with offices located at 513 Finance Building, Harrisburg, PA 17120.

6.      Defendant Sheridan Thompson-Clark is an adult individual and SEAP- CCO Program Facilitator and is located at the State Employee Assistance Program Central Coordinating Office ("SEAP-CCO"), 100 East Penn Square, Philadelphia, PA 19107-3387.

7.      Defendant Debbie Loughman is an adult individual and the SEAP Coordinator for the Pennsylvania Department of Transportation, with an address at 1101 South Front Street, Harrisburg, PA 17113.

8.   Defendant Karen Mitchell is an adult individual and the Director of Human Resources for the Pennsylvania Department of Transportation with offices at the PennDOT Central Office, Keystone Building, 400 North Street, Harrisburg, PA 17120.

Jurisdiction and Venue

9.   Jurisdiction is predicated upon 28 U.S.C. §1331, involving a federal question, as Plaintiff alleges that the State Employee Assistance Program promulgated by the Commonwealth of Pennsylvania is constitutionally infirm in that it violates procedural due process guarantees under the Fourteenth Amendment to the United States Constitution. Jurisdiction is also predicated upon 28 U.S.C.§1343(3), the jurisdictional corollary to 42 U.S.C.§1983, which imposes civil liability upon any person who, acting under the color of state law, deprives another of the rights, privileges and immunities secured by the Constitution or federal laws.

10.   Venue is proper in the Middle District of Pennsylvania in that Plaintiff resides in Cumberland County, Pennsylvania and his former employer, the Pennsylvania Department of Transportation, is located in Dauphin County, Pennsylvania.

Background Facts

11.   Plaintiff Randy Zimmerman (hereinafter ,"Zimmerman" or "Plaintiff")  was employed by the Pennsylvania State Police on or about April 17, 1999, after which he was transferred back to the Pennsylvania Department of Transportation ("Penndot") where he had originally been employed. In July, 1999, he was assigned temporary status as a Clerk II in the Bureau of Motor Vehicles.

12.   After working as a temporary employee for a period of five years, Plaintiff was given status as a permanent employee on or about February, 2006.

13.   On October 20, 2006, Zimmerman was given a Performance Review for the period February, 2006 through July, 2006 (see Exhibit "A" appended to this Complaint, copy of Employee

3

Performance Review). The Review was conducted by his supervisor, Heather Polek, and reviewed by Sandy Wolpert. The Review gave Zimmerman an overall satisfactory rating which it defined as, "[e]mployee meets the expectations and standards of the employee's job in a fully adequate way." Nevertheless, Plaintiff indicated his disagreement with this rating because he believed he should have been rated more highly due to the training he was conducting.

14.     On November 15, 2006, Zimmerman sent an e-mail transmission to Betty Serian, one of Penndot's Deputy Secretaries. This e-mail transmission (see Exhibit "B"to this Complaint, copy of transmission which was sent) complained about being harassed and asked if this was the thanks he got "for hard work and putting up with the civil rights violations and felonies that have been committed by others against me WHILE I WORKED FOR Penndot?"

15.     As a result of having sent this e-mail, Plaintiff was given a pre-disciplinary conference in which it was alleged that he had abused Penndot's e-mail policy. Because he was a member of the bargaining unit, an AFSCME representative attended this meeting.

16.     Although Zimmerman had done nothing more serious than engage in speech protected by the First Amendment to the United States Constitution, he was ordered by his immediate supervisor, Sandy Wolpert, Motor Vehicle Program Supervisor 2, into the SEAP Program via correspondence dated November 27, 2006 (see Exhibit "C" to this Complaint, copy of said correspondence). The Commonwealth justified this action, by stating as follows:

> This is in response to your observed inappropriate conduct and/or disruptive behavior that has occurred in connection with your employment. Consistent with our obligation to protect the health and safety of both yourself and your fellow employees while at work, the Commonwealth is concerned about your conduct and believes that it is necessary to take positive action. As such, we are directing you to contact the State Employees Assistance Program (SEAP) ... to schedule an appointment for an evaluation to determine your fitness for continued duty and type of treatment, if any, that you may require.
>
> (emphasis added)

4

17.     The correspondence to Zimmerman emphasized that it was "a direct order" to contact

SEAP by 5:00 p.m. on Tuesday, November 28, 2006 to schedule an evaluation "as soon as possible."

This Order effectively separated Plaintiff from his Commonwealth employment – notwithstanding

that he was protected by the Master Agreement between the Commonwealth and the American

Federation of State, County and Municipal Employees (AFSCME). It did so be stating, "[u]ntil you

receive further notice from Ms. Wolpert [Zimmerman's Supervisor], you are not permitted to report

to your position as a Clerk 2 in the Keystone Building; enter the workplace without prior

authorization."

18.     In addition, the letter concluded that "during your absence from the workplace for the

SEAP evaluation, an investigation will be conducted into your actions and behavior," further

threatening discipline upon his return.

19.     The true nature and motivation for the Commonwealth's action was revealed when

Plaintiff applied for unemployment compensation. Throughout the period of the events giving rise

to this cause of action until January 14, 2008, the Commonwealth maintained that Zimmerman was

an active employee – he just was not allowed to come to work or to be paid. Indeed, they placed

him on an involuntary extended FMLA [Family Medical Leave Act] leave. Notwithstanding this

official posture, Penndot sought to deny Zimmerman any unemployment compensation for his

constructive discharge by telling the Unemployment Compensation system that Plaintiff had

engaged in willful misconduct which justified their action. After a Hearing held on March 28, 2007, a

Referee concluded that the Commonwealth "involuntarily terminated" Zimmerman on November

27, 2006 and that it failed to meet its burden in demonstrating any "willful misconduct" (see Exhibit

"D" to this Complaint, copy of said decision).

20.     The animus toward Zimmerman orchestrated by officials of the Commonwealth was

revealed by his experiences with the SEAP program.

21.     According to the Governor's Office Manual, M505.3 amended, dated November 29, 2004, updating the October 28, 1998 State Employee Assistance Program (SEAP) supervisory manual, SEAP is designed to assist Commonwealth employees and their family members in resolving a wide variety of personal problems that may lead to deteriorating job performance or behavior. However, as delineated hereinafter, this process was utilized to rid Penndot of an employee it did not like and who could not be disposed of in any other manner since he was a member of the bargaining unit.

22.     The SEAP Program sent Zimmerman for several evaluations with Dr. Christopher Ziegler, a SEAP-contracted psychologist located in Harrisburg. This was done involuntarily under threat that unless he complied, he might not be returned to Commonwealth employment. Dr. Ziegler was aware that Penndot did not want this employee returned to full-time employment.

23.     Zeigler saw Zimmerman on November 28 and 30, 2006; December 1, 2006; and April 10, 2007. Despite not seeing Zimmerman clinically after April, 2007, Ziegler waited until June 21, 2007 to issue a report to Defendant Sheridan Thompson-Clark, SEAP-CCO Program Coordinator in Philadelphia, finding that "Zimmerman is deemed to be unfit for duty now and for the foreseeable future" (see Exhibit "E" attached to this Complaint, copy of said correspondence).

24.     Ziegler's psychological evaluation of Plaintiff observed at the outset and underscored Penndot's motivation in that Zimmerman was referred to the SEAP Program "after sending an inappropriate email to the Department Secretary claiming that he is being harassed and having his civil rights violated." Zeigler also noted that Zimmerman had made "vague remarks about possibly being persecuted because of reporting incidences of CDLs [commercial driving licenses] being sold." Ziegler also pointed out in his opening paragraph that SEAP had informed him that Zimmerman had "no real negative issues with co-workers."

6

25.    Paradoxically, despite finding that Zimmerman was unfit for duty for the "foreseeable future," Ziegler informed him, "if you can get a transfer, I'll release you to go back to work." Ziegler has acknowledged to at least one third party that he made substantially that statement to Zimmerman.

26.    Notwithstanding, Ziegler's explanation of his findings to Plaintiff was that he did not "look at things logically". Ziegler did not consider Zimmerman's Employee Performance Review, nor did he direct any questions during his meetings with Plaintiff relative to his ability to perform his duties as a Clerk II in the Department of Transportation.

27.    In his formal Psychological Evaluation, in which he cited Zimmerman's "disorganized thinking," Ziegler failed to relate this observation to an inability to perform the duties of a Clerk II position in the Department of Transportation. Indeed, Ziegler never asked for,  and consequently did not consider,  the job description for Zimmerman's position at PennDOT.

28.    Concluding that Plaintiff was in need of psychiatric stabilization. Zimmerman was sent by the SEAP Program to see Dr. Ali Ahmed, a psychiatrist contracted by SEAP and located in Camp Hill, Pennsylvania.

29.    On January 7, 2008 – after his evaluation and treatment of Plaintiff had been over for nearly nine months – when asked if Zimmerman was fit to return to duty, Ahmed blurted out, "they don't want him back to work."

30.    Indeed, Ahmed's course of treatment involved medicating Plaintiff with controlled substances leading to prolonged periods of sleep. When Zimmerman protested that he did not need such medication and actually cancelled one of his appointments with Ahmed, he received a letter from Defendant Sheridan Thompson-Clark alleging his non-compliance with the SEAP Program and threatening to have him discharged from the Program (and Commonwealth employment). In this letter, in response to Zimmerman's comment that his understanding was that he had been

terminated from Commonwealth employment, Thompson-Clark stated, "I ... advised you that it is my understanding that you have not been terminated [from Commonwealth employment] (see Exhibit "F" to this Complaint, copy of said letter). This was notwithstanding the fact that an unemployment hearing had been conducted; that Penndot had alleged his willful misconduct; and the findings of a Referee that Zimmerman had been terminated on November 27, 2006.

31.     On December 14, 2007, Defendant Karen Mitchell, PennDOT's Director of Human Resources, forwarded correspondence to Zimmerman (see Exhibit "G", appended to this Complaint), stating in part, "[o]n July 20, 2007, you were notified that consistent with your request you were granted sick leave without pay without benefits under Article 17, Section 6 of the Master Agreement." In fact, Zimmerman had never requested sick leave inasmuch as he was receiving unemployment compensation for what a referee had termed, his "involuntary termination" from PennDOT.

32.     The Mitchell letter notified Zimmerman that his six month entitlement to sick leave was due to expire on January 8, 2008 and that he had the following options: a) request a return to work, conditioned upon "medical documentation releasing you to full duty for your Clerk 2 position;" b) use available annual and sick leave; c) submit a voluntary resignation; or d) seek a disability or regular retirement.

33.     Since Dr. Ahmed had orally informed Zimmerman back in April, 2007, that he was able to return to work, Zimmerman sought medical documentation from Ahmed.  Dr. Ahmed balked at providing such documentation, indicating that he had not reviewed Zimmerman's records for some time. When pressed, Ahmed stated on January 7, 2008, "they don't want him to return to work."

34.     PennDOT's conduct in ridding itself of an employee it did not want by forcing him into the SEAP Program and "hanging him out to dry" was further revealed by the manner in which it handled Zimmerman's forced absence from work. On July 20, 2007, Human Resources Director

8

Mitchell wrote to him, stating in part: "... In our letter to you dated 6/8/07, you were asked to provide medical documentation to support your continued absence [as if Zimmerman's absence from work was at his own volition]. As of the date of this letter, we have had no response from you. This is your final opportunity to provide the requested documentation" (see Exhibit "H" to this Complaint, copy of said letter).

35.      Defendant Mitchell's letter proceeded to advise Zimmerman that he could take an additional six (6) months of leave without pay for a long -term illness by completing a "Serious Health Condition Certification Form", attached to her letter, and that failure to do so by the close of business on August 9, 2007 "will result in your absence being charged as Absent Without Leave ... an unapproved absence and could lead to disciplinary action, up to and including dismissal."

36.      Defendant Mitchell and PennDOT's action was disingenuous in that it was not a voluntary absence on Zimmerman's part, but forced upon him by PennDOT. Moreover, as Director of Human Resources, Mitchell was well aware that the Unemployment Compensation System had already determined that Zimmerman had been involuntarily terminated from his position.  Even more nefarious was  their attempt to force Zimmerman to certify that he had a serious health problem when, in fact, his position was that there was nothing wrong with him.

37.      Despite Mitchell's threats, Zimmerman took no action and Mitchell – without any authorization from Zimmerman – unilaterally put him on extended FMLA leave. This ended at the close of business on January 8, 2008, when Mitchell and PennDOT "administratively removed [Zimmerman] from [his] Clerk 2 position ... in the Bureau of Driver Licensing" (see Exhibit "I" appended to this Complaint, copy of January 14, 2008 correspondence of Karen Mitchell). The charade orchestrated by PennDOT, which began with an e-mail to the Deputy Secretary, ended with PennDOT's having forced mental health providers to use the SEAP Program to drive an undesirable from his Commonwealth employment.

9

## THE STATE EMPLOYEE ASSISTANCE PROGRAM (SEAP)

38.     The Executive Order establishing the State Employee Assistance Program (SEAP) , 1996-10, predicated the program on the following types of behavior, i.e., abuse of alcohol or other controlled drugs; family, financial, marital or personal problems; and workplace trauma, such as serious injuries, sudden death and violence.

39.     The purpose of the SEAP Program, as detailed in the referenced Executive Order, was limited to the following: a) to provide a comprehensive evaluation,  referral, and treatment system to address the abuse of alcohol and other controlled drugs, and emotional, family, financial, marital, and other personal problems which adversely affect the employee's personal life or job performance; b) to provide confidential consultation to managers, supervisors, union representatives, and employees on how to effectively intervene; and c) to provide timely, professional on-site services to address the emotional impact of traumatic events which occur in the workplace.

40.     None of the predicate behaviors or events, identified at paragraphs 38-39 above, relate to the situation involving this Plaintiff; stated otherwise, neither of the mental health providers [Zeigler or Ahmed] identified drug or alcohol abuse; personal problems affecting this employee's job performance;  or the potential for workplace trauma as behaviors or situations for which Plaintiff Zimmerman was susceptible .

41.     On October 29, 1998, the Governor's Office issued a Manual, M505.3 Amended, on the subject of the State Employee Assistance Program. This manual contained "Fitness For Duty Guidelines." Page 29 of this Manual defined "Impaired/Unfit For Duty" in the following language:

"An employee is considered impaired or unfit for duty if he or she cannot perform assigned duties in a proper, safe, and competent fashion for any reason. An employee's physical condition, intellectual ability to perform job duties, interpersonal behavior, and judgment are all factors that must be assessed in light of the safety and competency criteria. <u>The test for impairment or fitness for duty is whether a reasonable and prudent person would consider the employee's observed behavior to be incompatible with the safe and competent performance of his or her duties.</u> If the response to such a question is yes, a reasonable suspicion of impairment/unfitness exists" (emphasis supplied in original).

42.    On the eve of being placed in the SEAP Program, Plaintiff Zimmerman received a satisfactory review of his performance as a Commonwealth employee. In fact, he was being used to orient and to train certain new employees.

43.    On April 30, 2002, Procedures were developed "For making Referrals To The State Employee Assistance Program (SEAP) For The Purpose Of Obtaining An Independent Psychological Evaluation (IPE) For Behavioral Health Concerns." Item 2 of the Guidelines for Agency action requires that certain information accompany the request for an Independent Psychological Evaluation (IPE). This information includes, <u>inter alia</u>, a job description and performance history.

44.    Neither of the two mental health professionals utilized by the SEAP Program ever considered Zimmerman's job description, performance history, or continued ability to perform his job responsibilities. Neither did they ever conclude that he was unable to perform the duties of a Clerk II position in the Bureau of Motor Vehicles.

45.    In the letter of November 27, 2006, the Commonwealth predicated its action in forcing Zimmerman into the SEAP Program by way of an Independent Psychological Examination on the following rationale: "[t]his is in response to your observed inappropriate conduct and/or disruptive behavior that has occurred in conjunction with your employment. Consistent with our obligation to

11

protect the health and safety of both yourself and your fellow employees while at work, the Commonwealth is concerned about your conduct and believes that it is necessary to take positive action."

46.     Neither of the two mental health professionals utilized by the SEAP Program found that Zimmerman was a disruptive influence in the workplace or that he posed a threat to the safety of others. In fact, Dr. Ahmed told him in April, 2007 that he was able to return to work.

47.     When an employee is found to be unfit for duty, the referenced procedures (see Exhibit "J" appended to this Complaint, copy of IPE Procedures) contain the following instruction: "[t]he employee ... found unfit for duty ... must undergo treatment prior to being determined fit for duty. The employee is not permitted to return to work. If the employee successfully completes the recommended course of treatment, the SEAP-CCO will coordinate communication between the treatment program and the workplace. If the employee refuses to participate in treatment, the workplace will be notified and appropriate action taken."

48.     The instructions further state the standard for being able to be returned to work: "[i]n order for an employee to return to work, the agency must have documentation that he/she is able to perform his/her duties in a safe and competent manner."

49.     Neither of the SEAP-contracted mental health professionals ever determined that Zimmerman was unable to perform the duties of his job in a safe or competent manner.

50.     The referenced SEAP Manual and Procedures governing the IPE contain no due process protections enabling an employee to appeal or to seek review from an adverse IPE finding or determination. In the context of the present case, once Dr. Ziegler determined that Zimmerman was unfit for duty, Zimmerman had no recourse. Stated otherwise, Ziegler performed the function of prosecutor, judge and jury concerning Zimmerman's liberty and property interest in his employment.

12

51.     Indeed, Ziegler wrote his report so that it would be impossible for Zimmerman to return to work because, in Dr. Ahmed's words, "they don't want him back."

52.     Ziegler's report concluded as follows: "Mr. Zimmerman is found to be <u>not fit</u> for duty at this time. He is need of psychiatric stabilization and should be evaluated for the appropriateness of neuroleptics. At this time his mentation is so disordered that he is not likely to benefit from psychotherapy. I'll be happy to re-assess Mr. Zimmerman for his fitness -for-duty status once he is given the appropriate treatment" (emphasis supplied in original).

53.     Ziegler's conclusion says nothing about the safety of the workplace or Zimmerman's continued ability to perform the duties of his job. It failed to consider the Plaintiff's job description or performance review. This report was submitted six months after he had seen Zimmerman and <u>after</u> Zimmerman's treatment with Dr. Ahmed was concluded.

54.     In fact, Zimmerman did treat with the SEAP-contracted psychiatrist, Dr. Ahmed. This treatment consisted of medicating him. When this treatment ended, Dr. Ahmed and the SEAP Program failed to return Zimmerman to work or to send him back to Dr. Ziegler for further evaluation.

55.     Plaintiff Zimmerman was left with no recourse to protect the liberty and property interest in his employment.

APPLICATION OF LAW

56.     Based upon the report submitted by Dr. Ziegler and the collective actions of Defendants, Zimmerman was regarded as having a mental impairment that substantially limits one or more of the major life activities of such individual, including work within the meaning of the Americans With Disabilities Act, 42 U.S.C.§12102(2)(A) & (C).

13

57.     The Americans With Disabilities Act prohibits medical examinations, including psychological examinations, "unless such examination or inquiry is shown to be job-related and consistent with business necessity" 42 U.S.C.§12112(d)(4)(A).

58.     In the instant case, the Independent Psychological Examination (IPE) was not job-related and consistent with business necessity because it was outside the SEAP Program's own Guidelines in that a) it did not relate to the employee's performance on the job and b) it did not relate to the safety and health of those in the workplace.

59.     Accordingly, the IPE which was forced upon Zimmerman at the threat of termination violated the Americans With Disabilities Act because the Plaintiff was regarded as mentally disabled and the inquiry was not job-related or consistent with business necessity. Indeed, its purpose was to separate Zimmerman from his employment for which he had a liberty and property interest.

60.     Moreover, the SEAP program – both on its face and as applied to the present facts – violated procedural due process protections guaranteed by the Fourteenth Amendment to the United States Constitution. Where there is to be a deprivation of a property interest in employment, the state actor is required to hold a pre-termination Hearing in order to provide the individual with required procedural due process protections.

61.     The state procedures accompanying the deprivation of Zimmerman's liberty and property interests in his employment were clearly constitutionally infirm, in that the SEAP-contracted provider – working in combination with these Defendants – served as prosecutor, judge and jury. There was no mandated pre-termination Hearing. Thus, not only were the state processes inadequate to protect the due process rights of individuals like Plaintiff Zimmerman, they were wholly unavailable within the four corners of the SEAP Program Rules, Procedures and Guidelines.

62.     Pursuant to the Declaratory Judgments Act, 28 U.S.C. §§2201-2202, Plaintiff Zimmerman requests a declaration that, a) Pennsylvania's State Employee Assistance Program (SEAP) is

14

constitutionally infirm in that it fails to provide those forced into the Program with procedural due process protections guaranteed by the  Fourteenth Amendment to the United States Constitution; b) it violates the Americans With Disabilities Act, under the present facts, by requiring an independent psychological examination unrelated to business necessity or the requirements of employment; and c) that his involuntary admission to the SEAP Program was in retaliation for the exercise of Plaintiff Zimmerman's First Amendment rights.

WHEREFORE, it is requested that the Court grant declaratory relief as delineated at paragraph 62 above; that in accordance with said declaratory judgment, it grant a a mandatory preliminary injunction  reinstating Plaintiff Zimmerman to his Commonwealth employment with back pay; and that attorney's fees and costs be awarded, in accordance with 28 U.S.C. §1988(b).

Respectfully submitted,

John M. Kerr
Attorney I.D. #26414
Law Office Of John M. Kerr, Esquire
5000 Ritter Road
Suite 202
Mechanicsburg, PA 17055
(717) 766-4008
(717) 770-6019 (fax)
kerrlaw@comcast.net

Dated: March 24, 2008

# EMPLOYEE PERFORMANCE REVIEW

363L (Rev. 5/2001)

EPR Links Document

| **GENERAL INFORMATION** | TYPE REPORT | ☒ PROBATIONARY (CS/NCS union covered) | | ☐ INTERIM | ☐ ANNUAL |
|---|---|---|---|---|---|
| | | ☐ PROBATIONARY (CS non-union covered) | | ☒ INTERIM (6 month NCS/NUC/SMS) | |

| EMPLOYEE NAME | AGENCY | EMPLOYEE NUMBER |
|---|---|---|
| Randy Zimmerman | PENNDOT | 381592 |

| CLASS TITLE | ☐ SUPERVISOR | STATUS |
|---|---|---|
| Clerk II | ☒ NON-SUPERVISOR | ☐ CIVIL SERVICE  ☒ NCS  ☐ SMS |

| ORGANIZATION | RATING PERIOD |
|---|---|
| BDL | FROM 2/06     TO 07/06 |

| SUPERVISOR NAME | SUPERVISOR POSITION NUMBER |
|---|---|
| Heather Polek | |

## GENERAL INSTRUCTIONS

☐ *Verify/complete General Information.* **Indicate whether employee is a supervisor or non-supervisor.**

☐ *Review with the employee the employee's job description, job standards* (expectations/objectives/duties) *for the rating cycle* **to ensure the appraisal relates to the specific responsibilities, job assignments, and standards that were conveyed to the employee for the rating cycle.**
*(Link to STD-370, Blank Job Description Form)*

☐ *Base the appraisal on the employee's performance during the entire review period,* **not isolated incidents or performance prior to the current review period. Obtain/review necessary input and supporting data.**

☐ *Rate each factor in relation to the standards established and the guidelines listed on the form for each rating.*

☐ *Provide an overall rating* **based on the rating of the individual factors, adherence to significant performance standards, and accomplishment of essential functions. Each factor need not be of equal weight but comments should justify significant differences impacting on the overall rating.**

☐ *Assess employee strengths and identify opportunities where the employee could improve or requires additional knowledge or skill.* **Include projected development needs to meet anticipated assignments during the next rating period. Obtain employee input regarding their training needs. When rating employees, consider their participation and willingness to participate in employee development opportunities.**

☐ The *comments sections* should be used to: support performance ratings, indicate problem areas and provide guidance to employees on how to improve performance. *Comments MUST be provided for outstanding, needs improvement, and unsatisfactory ratings, and are highly recommended for all other ratings.* **Supervisor, reviewing officer, and employee comments are to be relevant and job related.** *(Additional comments for any sections should be placed on Page 5 of this form if completing form electronically or by attaching additional 8 1/2 by 11 paper in similar format)*

☐ *Discuss/obtain comments and signature/date* **of reviewing officer before discussion with employee.**

☐ *Sign/date the form, meet with employee to discuss the rating,* **and obtain the employee's signature/date/comments. Arrange for reviewing officer discussion if requested.**

☐ *Update* **with the employee the job description, essential job functions, and performance standards/objectives for the** *next rating cycle.*

## COMMUNICATION OF PERFORMANCE STANDARDS

*Indicate when you conveyed job standards to the employee and when progress review(s) was conducted:*

1. Performance standards (objectives, duties, expectations, etc.) for this rating period were conveyed to employee on _____ (date)
   _____
   (employee's signature)
   _____
   (supervisor signature)

2. Progress reviews were conducted:
   1st quarter date _____ employee initials _____ supervisor initials _____
   2nd quarter date _____ employee initials _____ supervisor initials _____
   3rd quarter date _____ employee initials _____ supervisor initials _____

**EXHIBIT A**

NAME: Randy Zimmerman                                                                 EMPLOYEE NUMBER:

# JOB FACTORS

**JOB KNOWLEDGE/SKILLS**  Measures employee's demonstrated job relevant knowledge and essential skills, such as work practices, policies, procedures, resources, laws, customer service, and technical information, as well as the relationship of work to the organization's mission. Also measured are the employee's self-improvement efforts to enhance skills and knowledge and to stay current with changes impacting the job.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ |
| • Possesses superior job skills and knowledge; effectively applies them to work assignments. <br> • Willingly mentors staff; shares knowledge. <br> • Seeks/applies innovative and relevant techniques. | • Work reflects thorough and current knowledge skill of job and impact on agency activities related resources. <br> • Uses opportunities to expand knowledge skills, sharing information with staff. | • Work reflects adequate knowledge/skills for job. <br> • Has some knowledge of related work. <br> • Stays current with major changes impacting on knowledge or skill. Accepts change. | • Often demonstrates a lack of basic or sufficient job knowledge/skills to perform routine functions of the job. <br> • Occasionally is resistant to changing knowledge and/or skill requirements or processes, including opportunities for knowledge/skill enhancement. | • Consistently demonstrates a lack of basic job knowledge and/or skills to perform job. <br> • Rarely takes advantage of available skill enhancement or training opportunities. <br> • Often is resistant to changing requirements. |

Comments: You demonstrate the knowledge of current office practices, procedures, and policies.

**2.  WORK RESULTS**  Measures employee's results in meeting established objectives/expectations/standards of quality, quantity, customer service, and timeliness both individually and in a team.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| ☐ | ☐ | ☒ | ☐ | ☐ |
| • Work consistently exceeds expectations of quality, quantity, customer service, and timeliness. | • Work frequently exceeds expected quality, quantity, customer service, and timeliness standards. | • Work usually meets expectations of quality, quantity, customer service, and timeliness. | • Often has difficulty meeting expected quality, quantity, customer service, and/or timeliness standards. | • Consistently fails to meet expected quality, quantity, customer service, and/or timeliness standards. |

Comments: Your work assignments are completed within assigned time schedules. With a few exceptions, you provide accurate and timely information/advise in a manner that meets your customers needs.

**3.  COMMUNICATIONS**  Measures employee's performance in exchanging information with others in an effective, timely, clear, concise, logical, and organized manner. Communications include listening, speaking, writing, presenting, and sharing of information. Consideration is given to client data, simpler forms.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| ☐ | ☐ | ☒ | ☐ | ☐ |
| • Consistently communicates in clear, effective, timely, concise, and organized manner. <br> • Is articulate and persuasive in presenting, soliciting complex or sensitive data. | • Frequently communicates in an effective, timely, clear, concise, and organized manner. <br> • Proficiently organizes and presents difficult facts and ideas orally and in writing. <br> • Seeks/provides feedback. | • Usually communicates effectively and exchanges relevant information in a timely manner. <br> • Speaks and writes clearly. <br> • Keeps others informed. <br> • Listens with understanding. | • Often fails to communicate effectively or in a timely manner. <br> • Lacks clarity of expression orally or in writing. <br> • Is inconsistent in keeping others informed. <br> • At times, fails to listen effectively. | • Consistently fails to communicate effectively or timely. <br> • Often does not keep others informed. <br> • Is an ineffective listener and/or frequently interrupts. |

Comments: You provide regular feedback to your supervisor regarding assignments, accomplishments, problems encountered, and assistance required.

**4.  INITIATIVE/PROBLEM SOLVING**  Measures the extent to which the employee is self-directed, resourceful, and creative in performing job duties individually or in a team. Also measures employee's performance in identifying and resolving problems; following through on assignments; and initiating or modifying ideas, methods, or procedures to provide improved customer service, redesign business processes, and accomplish duties.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| ☐ | ☐ | ☒ | ☐ | ☐ |
| • Consistently resolves unit/team problems and promotes improvements. <br> • Maximizes resources, innovation/technology to streamline/improve. <br> • Analyzes full dimension of complex problems. <br> • Requires minimal supervision. | • Prevents/resolves unit/team problems. <br> • Suggests innovations to improve operations or streamline procedures. <br> • Defines and analyzes complex problems. <br> • Develops/implements solutions with moderate supervision. | • Addresses existing and significant potential problems. <br> • Suggests or assists in developing solutions individually or in a team. <br> • Carries through solution implementation with routine supervision or follow-up. | • Resolves routine problems. <br> • Exhibits little initiative in identifying problems, solutions, or improvements and/or working proactively as part of a team to address issues of concern. <br> • Requires more than routine supervision. | • Consistently fails to recognize or seek help in resolving routine problems. <br> • Demonstrates inability to work individually or in a team. <br> • Rarely suggests improvements. <br> • Requires frequent reminders and supervision. |

Comments: You demonstrate the ability to determine what needs to be done according to established priorities and pursues appropriate means of accomplishing tasks.

.EE NAME: Randy Zimmerman

**EMPLOYEE NUMBER:**

**INTERPERSONAL RELATIONS/EQUAL EMPLOYMENT OPPORTUNITY, EEO:** Measures employee's development and maintenance of positive and constructive internal/external relationships. Consideration should be given to the employee's demonstrated willingness to function as a team player, give and receive constructive criticism, accept supervision, resolve conflicts recognize the wants and sensitivities of others, and treat others in a fair and equitable manner. Supervisors and team leaders also are to be assessed on their demonstrated commitment to Equal Employment Opportunity, diversity, and proactive actions to prevent/address all forms of discrimination.

| OUTSTANDING ☐ | COMMENDABLE ☐ | SATISFACTORY ☐ | NEEDS IMPROVEMENT ☐ | UNSATISFACTORY ☐ |
|---|---|---|---|---|
| • Consistently promotes and maintains a harmonious/productive work environment.<br>• Is respected and trusted and often viewed as a role model.<br>• Actively promotes EEO/diversity programs. | • Frequently fosters teamwork, cooperation, and positive work relationships.<br>• Handles conflict constructively.<br>• Promotes and adheres to EEO/diversity program requirements. | • Usually interacts in a cooperative manner.<br>• Avoids disruptive behavior. Deals with conflict, frustration appropriately.<br>• Treats others equitably. Adheres to EEO/diversity program requirements. | • Often has difficulty getting along with others. Allows personal bias to affect job relationships.<br>• Requires reminders regarding needs and sensitivities of others.<br>• Inconsistently adheres to EEO/diversity program requirements. | • Interpersonal relationships are counter-productive to work unit or team functions.<br>• Often ignores EEO/diversity program requirements. |

Comments:

6. **WORK HABITS** Measures employee's performance relative to efficient methods of operation, customer service, proper conduct, speech, ethical behavior, and Commonwealth/agency/work unit policies and procedures, such as attendance, punctuality, safety, security, proper care and maintenance of assigned equipment, and economical use of supplies.

| OUTSTANDING ☐ | COMMENDABLE ☐ | SATISFACTORY ☐ | NEEDS IMPROVEMENT ☒ | UNSATISFACTORY ☐ |
|---|---|---|---|---|
| • Work reflects maximum innovative use of time and resources to consistently surpass expectations and improve operations.<br>• Serves as role model with regard to work policies and safety standards. | • Frequently plans organizes work to timely and effectively accomplish job duties with appropriate use of resources.<br>• Suggests/implements improvements and exceeds organizational work/safety rules and standards. | • Work is planned to meet routine volume and timeliness and usually fulfills operational and customer service needs.<br>• Adheres to organizational work policies/safety rules and procedures with few exceptions. | • Frequently lacks organization and planning of work and does not adequately use available resources.<br>• Often does not meet standards in complying with work policies/safety rules and/or care of equipment. | • Consistently fails to meet expected standards due to lack of effective organization, use of equipment/resources, or inattention to customer service needs.<br>• Resists established work policies safety rules and procedures. |

Comments:  You need improvement on following Commonwealth agency work unit policies and procedures. The internet and email can be used for work related purposes only, unless you are on break or lunch. We will continue to monitor your internet & email use; further infraction will result in disciplinary action.

7. **SUPERVISION/MANAGEMENT** (Required for all supervisors/managers) Measures leadership, judgment, initiative, and achievement of expectations. Effectively manages program/projects, employees, budget, technology, and organizational change to produce positive results. Engages in strategic planning and measurement, performance management, teamwork, staff development, and recognition of accomplishments. Promotes customer service, diversity, inclusiveness, collaboration, effective communication, and positive labor/management relations. Uses innovation and fulfills administrative requirements.

| OUTSTANDING ☐ | COMMENDABLE ☐ | SATISFACTORY ☐ | NEEDS IMPROVEMENT ☐ | UNSATISFACTORY ☐ |
|---|---|---|---|---|
| • Regularly exceeds expectations.<br>• Implements innovative policies, resources, and technology to maximize efficiency and service.<br>• Committed to and promotes excellence; leads by example energizing performance and teamwork.<br>• Uses and encourages creative decisions and solutions.<br>• Acts as positive change agent. | • Meets and frequently exceeds expectations.<br>• Improves efficiency and customer service.<br>• Provides staff with innovative and constructive direction, delegation, feedback, mentoring, and recognition.<br>• Adheres to performance management/administrative policies.<br>• Makes sound decisions.<br>• Promotes and maintains teamwork, inclusiveness, respect, and creativity. | • Meets most expectations timely and effectively.<br>• Maintains acceptable efficiency and customer service.<br>• Provides staff necessary direction, feedback, development, and recognition.<br>• Makes decisions that usually reflect sound judgment.<br>• Usually adheres to administrative policies.<br>• Encourages innovation, teamwork, and inclusiveness. | • Often fails to meet expectations timely and effectively.<br>• Efficiency and customer service occasionally falls below standards.<br>• Inadequately directs, trains, monitors, and recognizes staff.<br>• Inadequately fulfills administrative and performance management functions.<br>• Often lacks good judgment in decisions.<br>• Lacks leadership in promoting innovation, teamwork, and inclusiveness. | • Consistently fails to meet expectations timely or effectively.<br>• Delivers unacceptable customer service or operational efficiency.<br>• Disregards or ineffectively provides staff direction, monitoring, and development.<br>• Often ignores performance management or administrative policies.<br>• Is indecisive or lacks good judgment.<br>• Resists change. |

Comments:

.E NAME: Randy Zimmerman                                    EMPLOYEE NUMBER:

## OVERALL RATING

**INSTRUCTIONS:** Provide an overall rating based on the rating of the individual factors, adherence to significant performance standards, and accomplishment of essential functions. This rating provides an overall impression of job performance that is *supported* by the job factor ratings, not necessarily an *average* of those ratings. Thus, each factor need not be of equal weight but comments should justify significant differences impacting on the overall rating.

| OUTSTANDING | COMMENDABLE | SATISFACTORY | NEEDS IMPROVEMENT | UNSATISFACTORY |
|---|---|---|---|---|
| ☐ | ☑ | ☒ | ☐ | ☐ |
| • Employee consistently and significantly exceeds job expectations and standards and demonstrates a high degree of initiative, customer service, and quality of work. | • Employee meets and frequently exceeds job expectations and standards and demonstrates a high degree of initiative, customer service, and quality of work. | • Employee meets the expectations and standards of the employee's job in a fully adequate way. | • Employee meets many of the expectations of the job in a satisfactory manner but often fails to adequately meet some of the expectations or standards. Improvement is required. | • Employee fails to meet many job expectations and standards. Performance deficiencies must be corrected. |

Overall Comments:   You have shown some improvement on the Motor Vehicle ROC run. You need to work on your multi-tasking skills and prioritizing your work appropriately; at times you seem to be overwhelmed. You have had very few processing errors, but need to work on improving your piece count.

**EMPLOYEE STRENGTHS:** Comments:

**OPPORTUNITIES FOR DEVELOPMENT:** Comments:  Continue to work on learning both MV & DL processes.

Rater's Signature:                                          Date:  10/26/06

## REVIEWER'S COMMENTS

Comments:

Reviewer's Signature:                                       Date:  10/20/06

## EMPLOYEE'S COMMENTS

☐ I AGREE WITH THIS RATING          ☒ I DISAGREE WITH THIS RATING

☐ I WOULD LIKE TO DISCUSS THIS RATING WITH MY REVIEWING OFFICER

☐ DISCUSSION WITH MY REVIEWING OFFICER OCCURRED _____
                                                      (DATE)

☐ I ACKNOWLEDGE THAT I HAVE READ THIS REPORT AND I HAVE BEEN GIVEN AN OPPORTUNITY TO DISCUSS IT WITH THE EVALUATOR; MY SIGNATURE DOES NOT NECESSARILY MEAN THAT I AGREE WITH THE REPORT.

Comments:
Checked areas commendable.

Employee's Signature:                                       Date:  10-20-06

YEE NAME: Randy Zimmerman | EMPLOYEE NUMBER:

## ADDITIONAL RATER'S COMMENTS

(Space will open as you type)

JOB KNOWLEDGE/SKILLS:
WORK RESULTS:
COMMUNICATIONS:
INITIATIVE/PROBLEM SOLVING:
INTERPERSONAL RELATIONS/EQUAL EMPLOYMENT OPPORTUNITY:
WORK HABITS:
SUPERVISION:
OVERALL RATING:
EMPLOYEE STRENGTHS:
OPPORTUNITIES FOR DEVELOPMENT:

## ADDITIONAL REVIEWER'S COMMENTS

## ADDITIONAL EMPLOYEE'S COMMENTS

## Zimmerman, Randy S.

**From:**    Zimmerman, Randy S.

**Sent:**    Wednesday, November 15  2006 11:09 AM

**To:**      Serian, Betty

**Subject:** harassment

Your people are down here harassing me and I sure don't appreciate what is going on. I will have no choice but to take this to a different forum. You know who I am and I saw you out front of leg services talking with some of your co-conspirators sometime back. Is this the thanks I get for hard work and putting up with the civil rights violations and felonies that have been committed by others against me WHILE I WORKED FOR Penn Dot? Are you or one of your people upset with me reporting to my supervisor about people that were trying to just buy CDL's. I worked in the choice point program and suggested to Darwin Nipple that he report it to you just in case of terrorism.? Maybe I should have been Homeland SECURITY Advisor!

Randy S. Zimmerman

EXHIBIT
B

E-2 (1-set 3, p#3)



PENNDOT

COMMONWEALTH OF
PENNSYLVANIA
DEPARTMENT OF
TRANSPORTATION
www.dot.state.pa.us

November 27, 2006

Randy Zimmerman
1017 Swarthmore Road
New Cumberland, PA 17070

Dear Mr. Zimmerman:

This is in response to your observed inappropriate conduct and/or disruptive behavior that has occurred in conjunction with your employment. Consistent with our obligation to protect the health and safety of both yourself and your fellow employees while at work, the Commonwealth is concerned about your conduct and believes that it is necessary to take positive action. As such, we are directing you to contact the State Employees Assistance Program (SEAP) at 1-800-692-7459 to schedule an appointment for an evaluation to determine your fitness for continued duty and type of treatment, if any, that you may require.

Accordingly, this is a **direct order** to contact SEAP by 5:00 pm on Tuesday, November 28, 2006 to schedule an evaluation as soon as possible. At the initial evaluation, you must provide both verbal and written consent to SEAP and the service provider(s) to allow for communication between SEAP, the evaluator, treatment and/or aftercare provider(s), employer, union, the Office of Administration SEAP staff and your office's SEAP Coordinator. Such communication will include confirmation of appointments; outcome of the assessment; recommendations for continued care, if required; and such other information as may be appropriate. Should treatment be required prior to, or after, your being released to return to work, you may utilize the appropriate paid leave to which may be entitled, or you may choose to utilize an appropriate leave without pay to which you may be entitled.

An Authorization for the Release of Information form is included with this letter. Please sign and date the form and return it to Sandy Wolpert at the conclusion of this meeting. This form will allow SEAP to confirm that you have followed my direct order to contact them, and will be used in conjunction with your evaluation by SEAP.

Until you receive further notice from Ms. Wolpert, you are not permitted to report to your position as a Clerk 2 in the Keystone Building; enter the workplace without prior authorization. Should you believe that it is necessary to seek such authorization, please contact Ms. Wolpert at 717-783-5730 to make the appropriate arrangements. The following items of Commonwealth property that are in your possession (Photo Identification Badge) are to be returned to Ms. Wolpert at the conclusion of this meeting.

Contingent upon your contact with SEAP by 5:00 pm on Tuesday, November 28, 2006 and your execution of all consents/authorizations, your time from the date of this letter through the time that an initial determination is made by SEAP regarding your fitness for duty, will be considered work time and you will be compensated accordingly.

**EXHIBIT
C**

E-24

Please be advised that during your absence from the workplace for the SEAP evaluation, an investigation will be conducted into your actions and behavior. Based upon the results of that investigation, a pre-disciplinary conference may be held upon your return to duty, and discipline may result.

Failure to adhere to any of the above directions will constitute insubordination, which will result in the issuance of the appropriate disciplinary action, up to, and including your removal from Commonwealth service. I sincerely hope that such action will not be necessary, and trust that you will comply with this direction in order that such action may be avoided.

Sincerely,

Sandy Wolpert
Motor Vehicle Program Supervisor 2

copy:  OA-SEAP
       Agency SEAP Coordinator
       Union
       * other staff consistent with the agency protocol for SEAP related documents

UNEMPLOYMENT COMPENSATION
BOARD OF REVIEW
Department of Labor and Industry
Commonwealth of Pennsylvania
UC-59 REV 6-02



| APPEAL NUMBER | 07-09-F-0815 |
| --- | --- |
| DATE MAILED | 3/30/2007 |
| FINAL DATE TO APPEAL | 4/16/2007 |
| SSN | 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 |

## REFEREE'S DECISION/ORDER

CLAIMANT                                                          EMPLOYER


RANDY S ZIMMERMAN                                PENN CENTRAL
1017 SWARTHMORE RD                              PO BOX 3253
NEW CUMBERLAND PA  17070                   HARRISBURG PA  17105


**CLAIM:**

FILED:                                      1/7/2007
DETERMINATION/S ISSUED:    2/16/2007                    BY:      LANCASTER UC SERVICE CENTER
        CLAIMANT DETERMINED UNDER UC LAW:    Eligible      402(b)
        FOR WAITING WEEK ENDING:
        FOR COMPENSABLE WEEK/S ENDING:

**APPEAL:**

FILED:             2/21/2007                          BY:    Claimant
HEARING HELD:   3/28/2007                        IN:    HARRISBURG, PA
        ATTENDED BY:    Claimant, Employer, Claimant's Attorney

**ENCLOSURE:**  A translation document UC-1627 is enclosed with this notice.

**FINDINGS OF FACT:**

1. Claimant was last employed by Penn Dot as a Clerk II until November 27, 2006, his last day at a final rate of pay of $11.97 per hour.

2. On November 15, 2006, claimant sent an email to one of the employer's Deputy Secretaries, which the employer deemed to be "a little off center".

3. Based on this email, claimant was given a pre-disciplinary conference to allow him to explain the email.

4. The employer believed that claimant's explanation was rambling and believed that both the email and his statement at the pre-disciplinary conference may present a "fitness for duty" issue.

5. Claimant was sent to the State Employee Assistance Program where he saw a counselor.

6. Based on the counselor's assessment, claimant, was not permitted to return to work by the employer.

7. On November 27, 2006, claimant was involuntarily terminated from his employment with the employer because the employer believed that he had a "fitness for duty" issue.

**EXHIBIT
D**

**ISSUE:**  Has the employer met its burden of proving that the claimant was terminated for willful misconduct under Section 402(e) of the Law?

Claimant — RANDY S ZIMMERMAN                          Appeal — 07-09-F-0815

**REASONING:**   The Lancaster UC Service Center issued a Notice of Determination approving benefits for claimant under Section 402(e) of the Law but disapproving benefits for claimant under Section 401(d)(1) of the Law.  This determination was for the waiting week ending January 20, 2007, and the compensable weeks ending January 27 and February 3, 2007.

Section 402 of the Pennsylvania Unemployment Compensation Law provides in relevant part as follows:

An employee shall be ineligible for compensation for any week --

> (e)  In which his unemployment is due to his discharge or temporary suspension from work for willful misconduct connected with his work.

While the term "willful misconduct" is not defined in the law, the Board of Review and the Appellate Courts in numerous decisions have defined willful misconduct as an act of wanton or willful disregard of the employer's interests, a deliberate violation of the employer's rules, a disregard of the standards of behavior which the employer has a right to expect of an employee, or negligence indicating an intentional disregard of the employer's interests or of the employee's duties and obligations to the employer.

In cases involving Section 402(e) the employer has the burden of proving that the claimant was terminated for willful misconduct.

The Courts have held that if hearsay evidence is properly objected to, it is not competent to support a finding of fact. Where it is admitted without objection, it will be given its nature probative effect and may support a finding of fact if corroborated by any competent evidence in the record.  However, a finding of fact based solely on hearsay will not stand.  See Walker vs. Unemployment Compensation Board of Review 27 PA Commonwealth Court 522, 367 A.2d 366 (1976).

In the present case, there is insufficient, competent evidence on the record that claimant engaged in any conduct which could be considered willful misconduct under Section 402(e) of the Law.  Claimant, therefore, is not ineligible for benefits under that Section.

Section 401 of the Pennsylvania Unemployment Compensation Law states in relevant part as follows:

Compensation shall be payable to any employee who is or becomes unemployed and who --

> (d)(1)  Is able to work and available for suitable work.

In cases involving Section 401(d)(1) there is a presumption that one applying for unemployment compensation benefits is able and available for work.  In the present case there has been no evidence to rebut that presumption.  The Referee finds, therefore, that the claimant was able and available for work under Section 401(d)(1) and that the claimant is not ineligible for benefits under that Section.

**ORDER:**   The determination of the Office of Employment Security is **reversed**.  Benefits are **APPROVED**.

Donald J Thomas, Referee

Claimant — RANDY S ZIMMERMAN                    Appeal — 07-09-F-0815

kmr - 9125

Pursuant to the provisions of the Law, the above decision shall become final on the date it was mailed to the parties, unless any aggrieved party files a further appeal to the Pennsylvania Unemployment Compensation Board of Review within the fifteen (15) day appeal period.

**The last date to file an appeal to this decision is 4/16/2007.**

### IF YOU WISH TO FILE A FURTHER APPEAL

You have the right to file a further appeal to this decision within fifteen (15) days of the date of mailing. Your appeal must include the following information: ► your name; ► the claimant's name and social security number; ► the date of the decision being appealed; ► the reason for appeal; ► the appeal number; ► your address.  Under the provisions of Act 5 of 2005, you may file your own appeal, or your appeal may be filed by an attorney or by any other advocate of your choice.

**You may file your appeal by mail.** If you file your appeal by mail, the appeal is filed as of the date of the U.S. Postal Service postmark **or a U.S. Postal Service form 3817 (Certificate of Mailing) or** a U.S. Postal Service certified mail receipt. If there is no U.S. Postal Service postmark, the date of filing will be the date of a postage meter mark on the envelope containing the appeal. If the appeal contains neither a **postmark** nor a postage meter mark, the date of filing will be the date recorded by the Department when the appeal is received. Your appeal should be mailed to the following address:

      LANCASTER UC SERVICE CENTER
      60 W WALNUT ST
      LANCASTER, PA  17603-3015

**You may file your appeal by common carrier.** If you file your appeal by common carrier, the appeal is filed on the date it is delivered to the common carrier as established by the records of the common carrier. You should use the above address to send your appeal by common carrier.

**You may file your appeal by fax.** If you file your appeal by fax, it must be received by the Department by 11:59 p.m. on the last day to appeal. The filing date will be determined by the date of receipt imprinted by the receiving fax machine. If there is no receipt date imprinted by the receiving fax machine, the sender's fax banner will control the date of filing. If neither date appears on the fax, the date of receipt recorded by the Department will serve as the date of filing. Your appeal should be **faxed** to the following number:

      717-299-7557

NOTE:  A party filing an appeal by fax is responsible for delay, disruption or interruption of electronic signals and readability of the document and accepts the risk that the appeal may not be properly or timely filed.

**You may file your appeal via electronic mail (e-mail).** If you file your appeal by e-mail, the appeal is filed on the date of receipt recorded by the Department's electronic transmission system. If you wish to file your appeal by e-mail, forward your appeal information to the Department at:
      L&I-UC-Appeals@state.pa.us
WARNING:  Information submitted by e-mail is not secure.

NOTE:  A party filing an appeal via the Internet or electronic mail is responsible for using the proper format and for delay, disruption or interruption of electronic signals and readability of the document and accepts the risk that the appeal may not be properly or timely filed.

If you wish to file your appeal **In person,** you may do so at any CareerLink office during normal business hours on or before the last day to appeal shown above. The CareerLink office will forward your appeal to the UC Service Center for processing. Appeals cannot be filed in person at UC Service Centers.

**Auxiliary aids and services are available upon request to individuals with disabilities.**
**Equal Opportunity Employer/Program**

Claimant — RANDY S ZIMMERMAN                          Appeal — 07-09-F-0815

## ADDITIONAL INTERESTED PARTIES OR APPEARANCES AT HEARING

Claimant's Attorney


NICHOLAS MASTASH, ESQUIRE
MID-PENN LEGAL SERVICES
213-A NORTH FRONT STREET
HARRISBURG PA  17101

# Christopher J. Ziegler, Psy.D.

LICENSED PSYCHOLOGIST
2501 N. Third Street
3rd Floor, Landis Building
Harrisburg, PA 17110

717-782-6858                                                    fax-717-782-6859

June 21, 2007

Sheridan Thompson-Clark
SEAP-CCO
UBH
100 East Penn Square
Suite 400
Philadelphia, PA 19107

RE:    Randy Zimmerman

Dear Ms. Thompson-Clark:

I am writing to address the matter of the ongoing Fitness-For-Duty evaluation for Mr. Randy
Zimmerman being conducted.  Based upon all information gathered to date, Mr. Zimmerman is
deemed to be unfit for duty now and for the foreseeable future.

Please feel free to contact me at the above location if I may clarify the matter more or if new
information comes to light.

Respectfully,

Christopher J. Ziegler, Psy.D.
Licensed Psychologist

EXHIBIT
E

*E-4 Document and Envelope*

**STATE EMPLOYEE ASSISTANCE PROGRAM**
**CENTRAL COORDINATING OFFICE (SEAP-CCO)**
100 East Penn Square, Philadelphia, PA 19107-3387
TEL: 800-548-6549 Ext. 66796   FAX: 866-808-6208

June 7, 2007

Randy Zimmerman
1017 Swarthmore Road
New Cumberland, PA 17070

> RE: **Warning of Non-Compliance with Independent Psychological**
> **Evaluation/Fitness for Duty (IPE/FFD)**

Dear Mr. Zimmerman:

This letter is in regards to your non-compliance with the IPE/FFD process.

On 6/6/07 your provider advised me that you called your provider's office on 6/5/07 and left a voice mail message stating that you are canceling your 6/7/07 appointment. I called you on 6/6/07 to confirm that you had canceled the appointment and to ask you if you plan to reschedule the appointment. You advised me that you are not planning to reschedule the appointment, that you are not planning to return to see that provider nor do you plan to attend any further appointments with your initial evaluator. You further advised me that your understanding is that you have been terminated from employment with the Commonwealth of Pennsylvania. I then advised you that it is my understanding that you have not been terminated and that it is important that you attend your appointments as scheduled.

Your provider has rescheduled your 6/7/07 appointment to 6/12/07 at 10:30. **In order to return to compliance with the IPE/FFD process, you must attend the 6/12/07 appointment and all subsequent appointments with your provider and evaluator.** It is important that you comply with the IPE/FFD process and any recommended treatment plans. Failure to comply with the requirements including those of your evaluator/s and your treatment provider/s will be reported to your employer and will result in your discharge from SEAP.

I am sending a copy of this letter by fax to your SEAP coordinator. A copy of this letter was also sent to you by overnight and regular mail.

Sincerely,

Sheridan Thompson-Clark, MSW, LSW
SEAP-CCO Program Facilitator
800-548-6549 (66796)

cc:   Donna Hoskins-Helm, OA-SEAP
      Debbie Loughman, SEAP Coordinator

**EXHIBIT F**



COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF TRANSPORTATION
www.dot.state.pa.us

Bureau of Human Resources
Employee Services Division
P O Box 3253
Harrisburg, PA 17105-3253

**Via Certified and Regular Mail (#7003 1680 0005 1265 2622)**          **Employee** #381592

December 14, 2007

Randy Zimmerman
1017 Swarthmore Road
New Cumberland, PA 17070

Dear Mr. Zimmerman:

On July 20, 2007, you were notified that consistent with your request you were granted sick leave without pay without benefits under Article 17, Section 6 of the Master Agreement.  Your six month entitlement began on July 10, 2007, and will expire on January 8, 2008.

Listed below are the options currently available to you:

> You may request to return to work.  Such a request must be accompanied by medical documentation releasing you to full duty for your Clerk 2 position.  Such a request would be considered under Article 17, Section 6 of the Master Agreement.  Article 17, Section 6 does not guarantee you a position, and all placement options cease as of January 8, 2008.  If you wish to pursue placement options under Article 17, Section 6, please notify Michael Smith of the Bureau of Driver Licensing as soon as possible and provide him the above mentioned medical release.  Mr. Smith can be reached at (717) 783-5730.

> ____ You may use your available annual and sick leave.  Your leave balances as of the pay period ending 11/30/2007 are 2.11 hours of annual and 1.79 hours of sick.  If you choose this option, you must also notify us of your intentions after your available leave has expired.

> _____ You may submit a voluntary resignation.

> _____ You may be eligible for Disability or Regular Retirement.  To obtain detailed information regarding retirement benefits, please contact the State Employees Retirement System (SERS) Harrisburg Regional Office at 717-783-9065 or at 1-800-633-5461.

Please check the appropriate box regarding your decision, sign on the line stating employee's signature and return that copy to Laurie Cohrac at P.O. Box 3789, Harrisburg, PA  17105-3789 by **January 4, 2008.**  Failure to do so will result in your being administratively separated from employment with PENNDOT effective **January 8, 2008.**

**EXHIBIT
G**

If you decide to pursue returning to work you must notify **Michael Smith** of your intentions as soon as possible, and provide him with the medical release, so that we can research placement options for you under Article 17, Section 6. Again, if you are not returning to work by **January 8, 2008**, your rights to return to work cease as of that date.

If you have any questions concerning these options or your obligations, please contact Laurie Cohrac at (717) 783-6462.

Sincerely,

Karen Mitchell, Director
Bureau of Human Resources

_____          _____
Employee's Signature or Designee        Date

cc:    copy to employee
       Labor Relations
       FMLA File

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF TRANSPORTATION
www.dot.state.pa.us

**PENNDOT**

**VIA REGULAR AND CERTIFIED MAIL (#7003 1680 0005 1264 8618)**          **E#381592**

July 20, 2007

Randy Zimmerman
1017 Swarthmore Road
New Cumberland PA 17070

Dear Mr. Randy Zimmerman:

The Commonwealth's leave policy entitles employees to an initial six (6) months (982.50 hours) of Sick Leave without Pay with Benefits.  This entitlement includes both short and long term absences and is cumulative.   In our letter to you dated 06/08/07, you were asked to provide medical documentation to support your continued absence.  As of the date of this letter, we have had no response from you.  This is your final opportunity to provide the requested documentation.

From 01/05/2007 through 07/09/2007, you have used a cumulative total of 982.50 hours of sick leave without pay, with benefits.  As of 07/09/2007, you have exhausted your initial six months of Sick Leave without Pay with Benefits.  All leave used under this provision is designated as leave under the Family and Medical Leave Act.

However, the Commonwealth Leave Policy provides for an additional six (6) months (982.50 hours) of leave without pay for a long-term illness which is defined as greater than one full pay period.  Please understand that this is <u>without benefits</u>.  In order for us to determine your eligibility for this leave, you must provide to your supervisor the following information by close of business, August 9, 2007.  Both items listed below are necessary to support a request for sick leave without pay without benefits.

- A written request for the use of sick leave without pay without benefits
- A Serious Health Condition Certification Form (copy enclosed) completed by your health care provider.  This certification form must provide proof of illness or disability, a prognosis and an expected date of return to work.

Failure to provide the requested documentation by close of business August 9, 2007 will result in your absence being charged as Absent Without Leave (AW).  Code "AW" is an unapproved absence and could lead to disciplinary action, up to and including dismissal.

The Commonwealth Leave Policy states, "Employees who are granted a second six months of sick leave without pay only have the right to return, before or upon the expiration of the second six month, to a vacant position that the employee is qualified for and the agency intends to fill."

**EXHIBIT
H**

Randy Zimmerman
July 20, 2007
Page 2 of 2


Your entitlement to health care benefits and group life insurance expired at midnight on 07/09/2007. For continuity of coverage, you can elect to pay for these benefits as follows:

- COBRA continuation coverage notice will be sent to you from the Pennsylvania Employees Benefit Trust Fund (PEBTF) regarding your health/medical and supplemental benefits (dental, vision, hearing and prescription). This notice will specify the coverage available, monthly rates and other billing procedures. You have up to 60 days from the date of this notice to elect COBRA coverage. Upon electing COBRA in a timely manner, coverage will be retroactive to the first day of your "without benefits" status. If you do not elect COBRA, the PEBTF will bill you for any ineligible claims paid after the date coverage ended.

- A conversion notice will be sent to you from the Commonwealth's group life insurance (GLI) carrier, Prudential Insurance Company of America, regarding your group life insurance policy. You have a 31-day period following the date of expiration or 15 days from the date of the conversion notice to apply for this coverage. If you have questions regarding GLI, please contact Prudential's Customer Service Department at 1-800-893-7316.

Another option available for your consideration is Disability Retirement, if you are unable to work. You would be entitled to medical benefits if the Disability Retirement is approved. This option requires 5 years of service at any age. Regular retirement with fully paid medical benefits requires you to have 15 years of service at age 60 or older, or 25 years of service at any age. For more detailed information concerning your eligibility for retirement benefits, you may contact the State Employees' Retirement System's local office 1-800-633-5461.

If you have any questions, please contact Laurie Cohrac of my staff at (717) 783-6462.

Sincerely,

Karen Mitchell, Director
Bureau of Human Resources

Enclosures:  Notice to employee - Sick Leave without Pay
             Serious Health Condition Certification Form
             Written Request Form


lac

cc:    Sandy Wolpert, Manager
       Carol Sheets, Manager
       Anthony Reda, LR Analyst
       FMLA File

# Contact Us - General Information

**Please select from the options at the left to submit comments/concerns to the appropriate area of PennDOT.**

- For information related to drivers' licenses and vehicle registrations, call 1-800-932-4600 from in state and 717-412-5300 from out of state or visit the Driver and Vehicle Services Customer Call Center.

- For Winter Interstate Road Conditions call 1-888-783-6783 (In PA) or 717-783-5186 (out of state) Note: These numbers are only operational from November 1st to April 30th.

- Call 1-800-FIX-ROAD to report Potholes or submit any specific roadway concerns (including potholes) electronically by visiting the Customer Care Center.

- For general information about PennDOT and its services, please call (717) 787-2838 or send a letter to the following address:

  **PennDOT Central Office**
  Keystone Building
  400 North Street
  Harrisburg, PA 17120
  General Information: 717-787-2838
  Email Central Office

  *Note, this contact information should not be used for DMV questions. For DMV related concerns please visit the Driver and Vehicle Services Customer Call Center.
- **PennDOT Press Office**
  717-783-8800
- **Riverfront Office Center (Driver and Vehicle Services)**
  1101 South Front Street
  Harrisburg, PA 17104-2516
  General Information: 1-800-932-4600
  Fax: 717-783-0505

  Hours of Operation:
  Motor Vehicle and Driver Licensing Renewal Hours: Mon-Fri 7:30-4:30pm, Sat 7:30-12:00 Noon
  Driver Exam Hours: Tues - Sat 7:30am-4:30pm
  Photo License Center Hours: Mon., Tues., Wed., Fri., Sat. 7:30am-4:30pm, Thurs. 7:30am-8:00pm
- Contact the PennDOT Webmaster

**ATTENTION EMPLOYEE...**

A written request is required with your Serious Health Condition when using leave without pay. Please provide your request below indicating what type of leave you would like to use and length of time to use the leave. Please sign and date your request when completed.

Name (Print): _____

Signature: _____

Date: _____

Supervisor's Name (Print): _____

Supervisor's Phone Number: _____

### YOUR RIGHTS UNDER THE FAMILY AND MEDICAL LEAVE ACT OF 1993

FMLA requires covered employers to provide up to 12 weeks of unpaid, job-protected leave to "eligible" employees for certain family and medical reasons. Employees are eligible if they have worked for a covered employer for at least one year and for 1,250 hours over the previous 12 months.

REASONS FOR TAKING LEAVE: Unpaid leave must be granted for any of the following reasons:

- To care for the employee's child after birth, adoption or foster care placement.
- To care for the employee's spouse, child or parent who has a serious health condition.
- For a serious health condition that makes the employee unable to perform the employee's job.

At the employee's or employer's option, certain kinds of paid leave may be substituted for unpaid leave.

ADVANCE NOTICE AND MEDICAL CERTIFICATION: The employee may be required to provide advance leave notice and medical certification. Taking of leave may be denied if requirements are not met.

- The employee ordinarily must provide advance notice when the leave is "foreseeable."
- An employer may require medical certification to support a request for leave because of a serious health condition and may require second or third opinions (at the employer's expense) and a fitness for duty report to return to work.

JOB BENEFITS AND PROTECTION:

- For the duration of FMLA leave, the employer must maintain the employee's health coverage under any "group health plan."
- Upon return from FMLA leave, most employees must be restored to their original or equivalent positions with equivalent pay, benefits and other employment terms.
- The use of FMLA leave cannot result in the loss of any employment benefit that accrued prior to the start of an employee's leave.

UNLAWFUL ACTS BY EMPLOYERS: FMLA makes it unlawful for any employer to:

- Interfere with, restrain or deny the exercise of any right provided under FMLA.
- Discharge or discriminate against any person for opposing any practice made unlawful by FMLA or for involvement in any proceeding under or relating to FMLA.

ENFORCEMENT:

- The U.S. Department of Labor is authorized to investigate and resolve complaints of violations.
- An eligible employee may bring a civil action against an employer for violations.

FMLA does not affect any federal or state law prohibiting discrimination or supersede any state or local law or collective bargaining agreement which provides greater family or medical leave rights.

FOR ADDITIONAL INFORMATION: Contact the nearest office of the Wage and Hour Division listed in most telephone directories under U.S. Government, Department of Labor.

## NOTICE TO EMPLOYEES – SICK LEAVE WITHOUT PAY

The Family and Medical Leave Act of 1993 (FMLA) requires that the Commonwealth provide at least 12 weeks of leave (with or without pay) with benefits within a rolling 12 month period to employees who have serious health conditions; who become parents through childbirth, adoption, or foster care placement; or who are needed to care for a seriously ill family member, as long as the employee has been employed at least one year (total employment, even if the employment was not continuous) and has been paid for at least 1,250 hours (which includes regular and overtime hours paid, but excludes holidays and other paid time off) during the previous 12 month period. Provided below is information about the Commonwealth's sick leave without pay with benefits program. All sick leave without pay used will be designated as leave under the provisions of the FMLA.

Permanent employees are entitled to six months (982.50 for employees who work 7.5 hour days, 1,048 hours for employees who work 8.0 hour days, or a prorated amount of hours for part-time employees) of sick leave without pay for illness or disability due to a serious health condition. To be eligible for this leave, some union contracts require employees to have at least six months of credited service. Leave time is calculated on an hour for hour basis against the hours of entitlement.

Written notification requesting sick leave without pay, along with a doctor's certificate which provides proof of disability, prognosis, and expected date of return to work, must be submitted in advance if circumstances permit. And, upon return to work, employees must provide a doctor's release to perform full duties.

Before, during, after, or instead of sick leave without pay, employees may use accrued annual, personal, sick leave provided the leave would qualify as sick leave without pay. The use of paid leave shall not be included when calculating the sick leave entitlement.

Employees may use leave on an intermittent or reduced-time basis at any time before the initial sick leave without pay entitlement expires. Contact the Human Resource Office for details regarding this option.

Upon request and certification from a physician which provides proof of continuing disability, prognosis and expected return to work date, employees who are unable to return to work after the expiration of the initial six month sick leave without pay entitlement, shall be granted an additional six months of sick leave without pay without benefits.

Employees are eligible for a maximum of six months (982.50 hours for employees who work 7.5 hour days, 1,048 hours for employees who work 8.0 hour days, or a prorated amount of hours for part-time employees) of benefits while on sick leave without pay. The benefit entitlement includes both short and long-term unpaid absences, and is cumulative for both sick and parental leave. The following benefits continue during the entitlement period:

- Group Life Insurance coverage will continue to be state paid.

- For full-time employees, medical/hospital coverage will continue.

- Part-time employees enrolled in the Basic Option will be required to pay the employee share toward the cost of that coverage while on leave. The PEBTF will bill employees for that share.

- Supplemental benefits through the PEBTF, Supplemental Benefits Division, will continue. Employees who have supplemental benefits through a health and welfare fund should contact the health and welfare fund to determine if coverage continues.

Employees have the right to return to the same position or an equivalent position with regard to pay and skill upon return from leave without pay. Employees who are granted a second six months of sick leave without pay only have the right to return, before or upon the expiration of the second six months, to a vacant position that the employee is qualified for and the agency intends to fill. Failure to return to work following the termination of a leave without pay shall subject the employee to disciplinary action up to and including termination effective on the first day after the leave without pay ends.

Questions concerning sick leave without pay or the benefit entitlements while on a leave without pay may be referred to the Human Resource Office.

**Family and Medical Leave Act**                           **COMMONWEALTH OF PENNSYLVANIA**
**Serious Health Condition Certification**                 Employee Form

**FOR THE EMPLOYER TO COMPLETE:**

| Employee | Employee Number |
|---|---|
| Agency | Work Location |

**FOR THE HEALTH CARE PROVIDER TO COMPLETE:**

1. When did the condition commence?

2. When did the incapacity commence?

3. Is the patient presently incapacitated?
   ☐ Yes          ☐ No          If no, when was the employee able to return to work?

   A. If yes, is the employee unable to perform work of any kind?
      ☐ Yes                 ☐ No

   B. If yes, what are the physical or mental impairments that prevent the employee from being able to work?

   C. If yes, what essential functions (essential functions attached) of the job can the employee not perform?

   D. If yes, what is the prognosis and expected date of returning to light duty or full duty work?

4. Has a regimen of continuing treatment been prescribed?
   ☐ Yes          ☐ No

   A. If yes, please describe the type of treatment, i.e. physical therapy, prescription drugs, etc.

   B. If yes, has the employee completed the regimen?
      ☐ Yes                 ☐ No

   C. If yes, and the employee has not completed the regimen, can the employee work while continuing on such regimen? If no, why?
      ☐ Yes                 ☐ No

5. Are additional treatments required for this condition?
   ☐ Yes          ☐ No

   A. If yes, where will the treatments be provided?  If not in your office, will you remain involved with the treatment?

   B. If yes and if known, what are the dates of the next several treatments?

   C. If yes, how long will treatments continue?

   D. If yes, how long will the employee be incapacitated before and after such treatments?

6. Will it be necessary or possible for the employee to work intermittently or on a less than full schedule?
   ☐ Yes          ☐ No



**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF TRANSPORTATION**
www.dot.state.pa.us

Bureau of Human Resources
Labor Relations Division
P O Box 3789
Harrisburg, PA 17105-3789

Regular and Certified Mail (7003 1680 0005 1265 1373)          Employee # 381592

January 14, 2008

Mr. Randy Zimmerman
1017 Swarthmore Road
New Cumberland, PA 17070

Dear Mr. Zimmerman:

This is to notify you that you have been administratively removed from your Clerk 2 position, regular Non-Civil Service status, in the Bureau of Driver Licensing effective the close of business on January 8, 2008.

The reason for this action is you have exhausted all entitlements, under Article 17, Section 6 of the AFSCME Master Agreement. You were notified of your status on December 14, 2007 and failed to select an available option listed in that notice. That letter clearly put you on notice that failure to select an available option would result in removal from your position.

Please immediately return any State property that is in your possession (including the following items: records; keys; tools; equipment; books; reports; manuals; identification cards; etc.) to Mr. Michael Smith at 717-783-5730.

You may contact the State Employees Retirement System at 1-800-633-5461 regarding your retirement benefits.

Since your position is covered by a recognized bargaining unit, whether or not you are a member of the union, you may appeal this action at the appropriate step of your labor agreement's grievance procedure.

Sincerely,

Karen Mitchell, Director
Bureau of Human Resources

for

Allen D. Biehler, P.E.
Secretary of Transportation

Attachments

**EXHIBIT**
I

*[handwritten top-left: E-3 - ## SEAP process 11 pages]*

4/30/02

## PROCEDURES FOR MAKING REFERRALS TO THE STATE EMPLOYEE ASSISTANCE PROGRAM (SEAP) FOR THE PURPOSE OF OBTAINING AN INDEPENDENT PSYCHOLOGICAL EVALUATION (IPE) FOR BEHAVIORAL HEALTH CONCERNS

**Important Note:  If the employee has verbalized a plan/intent to harm themselves or others, _and_ has the means or has already taken action on his/her plan, then the appropriate emergency response should be contacted immediately (crisis intervention, police, and/or ambulance). Any consideration of an IPE or COCE should be held in abeyance until safety has been established.**

The following protocol should be used when an agency has a significant concern for the mental health of an employee.  The protocol should be used when the situation has not progressed to the stage described above, and when the agency's initial assessment is that there are insufficient grounds for a Condition of Continued Employment (COCE).

Nothing contained in this process is intended to limit the statutory or contractual rights of an employee.  As appropriate, agencies are encouraged to actively solicit the involvement and support of the union throughout this process.

I.      **INITIAL AGENCY ACTION**

Agency          1.  The Human Resource Director, Labor Relations Specialist, SEAP Coordinator, and/or other responsible manager designated by the agency, in consultation with the SEAP Coordinator, makes a determination that the agency believes that an employee needs to be evaluated for the purpose of determining if significant psychological problems exist which may result in harm to self, others or affects the ability to perform his/her assigned duties in a safe and competent manner. The "Guidelines to Detect Warning Signs of High-Risk Behavior" should be used, as appropriate, in making this determination.

For this purpose, competency is defined as the ability of an employee to perform his/her duties in such a manner that the health and safety of the employee or others is not at risk of being compromised or that the behavior does not significantly affect the Commonwealth in an adverse manner.  This does not include those employees that may be performing at a "needs improvement" or an "unsatisfactory" level due to a lack of training or skills.

Agency          2.  The Human Resource Director/Labor Relations Specialist or manager consults with the agency/field SEAP Coordinator who will then contact Office of Administration SEAP (OA-SEAP) staff and provide information pertaining to the requested IPE referral.  This information should include a completed "Advance Notification" form, witness statements, job description, discipline history, performance history, previous supervisory efforts to address the problem and all other appropriate documents.

*[handwritten left margin: Query: who made the IPE referral?]*

OA-SEAP         3.  OA-SEAP discusses the IPE request with the agency/field SEAP Coordinator. If an IPE is deemed appropriate, OA-SEAP will approve the IPE request and provide the template IPE letter to the agency for drafting.  If an IPE is not

**EXHIBIT J**



4/30/02

approved, the agency will be advised on how to best respond to the current situation.

NOTE:   Given the various circumstances that may exist, the initial action taken by an agency may vary depending on the severity of the case.  Health and safety concerns will dictate the course of action.

> If the employee is considered a risk to others, he/she should be removed from the workplace.

> If the employee is considered a risk to self, it may be appropriate to allow the employee to remain at work until he/she can be safely removed.

> If the employee has committed a serious infraction, it may be appropriate to "suspend pending investigation" pending consideration of further action.

> Given the circumstances of the incident, it may be more appropriate to pursue a COCE rather than an IPE.

> Other safety concerns including security and access to buildings and staff will also be considered.

All these considerations will be discussed during the agency's initial contact with OA-SEAP.

OA-SEAP      4. If an IPE is approved, OA-SEAP notifies the SEAP Central Coordinating Office (SEAP-CCO) and provides the advance information on the referral.

Agency      5. The agency SEAP Coordinator provides a draft copy of the proposed IPE letter to OA-SEAP and identifies the date and time when the employee will be presented with the IPE letter.  OA-SEAP approves the IPE letter or makes recommendations for changes and advises the agency accordingly.  The letter (format attached) will include standard language directing the employee to undergo an IPE, and shall also include the following:

> Statement directing the employee to contact SEAP by a certain date and time (normally within 24 hours).

> Statement directing the employee to sign all necessary consent forms to allow communication between the clinician, SEAP, OA-SEAP and the workplace.

> Statement directing the employee to provide authorization to the clinician and SEAP to provide the workplace with relevant information concerning the outcome of the evaluation.

> Statement explaining how any time period off the job will be handled (please see Section III).

NOTE:  Addendums or other provisions that limit or restrict an employee's contractual rights are prohibited.

*E-3*

4/30/02

| OA-SEAP | 6. | OA-SEAP notifies the SEAP-CCO that an IPE referral has been finalized and is expected to be presented to the employee on the specific date and time determined by the agency. OA-SEAP provides SEAP-CCO with a copy of the draft IPE letter and all relevant information and documentation (job description, essential functions incident reports, etc.). |
|---|---|---|
| SEAP-CCO | 7. | The SEAP-CCO selects and contacts a qualified evaluator, and provides relevant information/documents and a copy of the IPE letter to the evaluator. |
| Agency | 8. | After receiving approval from OA-SEAP for the IPE and the agency letter, the SEAP Coordinator and other agency staff meet with the employee to explain the reason for the action, present the IPE letter, and explain the letter. If requested by the employee, the agency shall include the union in the meeting. Participants in the meeting should be limited to only essential staff. **As appropriate, the SEAP Coordinator places the call to SEAP for the employee at the conclusion of the meeting. The employee shall be provided privacy when talking with the SEAP-CCO.** |

*was this the meeting the Union repre. was present for?*

| Agency | 9. | As previously discussed with OA-SEAP, any appropriate safety/security steps should be taken if the employee is directed not to return to the workplace. |
|---|---|---|
| Agency | 10. | The Agency SEAP Coordinator immediately provides a copy of the signed IPE letter to the OA-SEAP office by fax. |
| OA-SEAP | 11. | OA-SEAP faxes a copy of the signed IPE letter to SEAP-CCO. |

## II.   SEAP EVALUATION PHASE

| Employee | 1. | Contacts the SEAP-CCO within the prescribed time period and provides information relating to the reason for referral. |
|---|---|---|
| SEAP-CCO | 2. | Explains the services offered by SEAP-CCO, the role of the CCO in this type of referral, answers questions, verifies employee understanding of the situation, completes the intake process and confirms appointment information. |
| Evaluator | 3. | Confirms appointment and completes evaluation within 3 workdays. If necessary, conducts additional sessions to complete evaluation phase. Upon completion of each session, evaluator verbally notifies SEAP-CCO. If additional evaluations/tests are indicated, evaluator notifies SEAP-CCO and promptly schedules such additional evaluations/tests. |
| SEAP-CCO | 4. | Contacts OA-SEAP and the agency/field SEAP Coordinator to confirm that the employee has contacted SEAP and the date and time of the evaluation. If the employee does not contact the SEAP-CCO in accordance with the IPE frames contained in the letter, or fails to keep the scheduled appointment, the agency/field SEAP Coordinator will be notified, and appropriate action must be initiated (in a manner similar to the COCE process). |

*E-3*

4/30/02

SEAP-CCO    5.  Contacts OA-SEAP and the Agency SEAP Coordinator to confirm the results of the evaluation.  Provides written confirmation to OA-SEAP and the Agency SEAP Coordinator.  Communication will include a statement regarding the employee's fitness for duty, treatment recommendations and any other work-related recommendations or adjustments deemed appropriate by the evaluator and SEAP-CCO.

Note:  The following are likely outcomes of the evaluation process:

➢ The employee is found fit for duty with no recommendations for treatment.  In this case, the employee should be returned to work immediately.

➢ The employee's fitness for duty has not been established and additional testing or sessions are required.  In this case, the employee remains out of the workplace.

➢ The employee is deemed fit for duty; however, treatment recommendations have been provided to the employee.  In this case, the employee should be immediately returned to work.  Continuation in treatment is at the employee's discretion and cannot be mandated by the workplace.

*They violated this provision*

➢ The employee is found unfit for duty and must undergo treatment prior to being determined fit for duty.  The employee is not permitted to return to work.  If the employee successfully completes the recommended course of treatment, the SEAP-CCO will coordinate communication between the treatment program and the workplace. If the employee refuses to participate in treatment or does not successfully complete the treatment, the workplace will be notified and appropriate action taken.

Agency    6.  Conveys information about the evaluation process to those individuals
SEAP        identified on the consent form.
Coordinator

## III.  CONFIDENTIALITY

All information obtained, including initial phone contact, evaluation, treatment, and follow-up are subject to strict federal and state regulations governing confidentiality.  All information is kept by the SEAP-CCO and is not made available to the workplace, union, OA-SEAP, or anyone else without the employee's informed written consent.

Federal *Public Law 92-255, Drug Abuse Prevention, Treatment and Rehabilitation Act 21 U.S.C. §1101 et seq* and *§§4 and 8 of the Drug and Alcohol Abuse Act of April 14, 1972, and Pennsylvania P.L. 221, No. 63, 71 P.S. §§1690.104* and *1690.108,* set forth specific restrictions concerning the release of information.

The federal regulations contain specific penalties for violations of the federal confidentiality regulations. Further, *Management Directive 505.22* allows for discipline, up to and including termination, for violating confidentiality.  Any question or concern regarding confidentiality should be directed to the SEAP-CCO or OA-SEAP.

E-3.

4/30/02

In order for an employee to return to work, the agency must have documentation that he/she is able to perform his/her duties in a safe and competent manner. To facilitate this communication, the SEAP service provider must obtain the informed written consent of the employee. In cases where an employee chooses to disclose information, an informed written consent will specify the limited information to be disclosed, purpose of disclosure, and an expiration date for the consent. If the employee fails to sign this limited informed written consent, the employee will be considered to have disobeyed a direct work order, and will be subject to appropriate discipline, up to and including termination. Upon obtaining a properly executed consent form, the SEAP-CCO will screen all information prior to disclosure and will limit the information on a need-to-know basis. For the purpose of an IPE, the information is typically limited to the following:

1. Date of evaluation session

2. Determination concerning the employee's ability to return to work

3. If applicable, if treatment will be required prior to an employee's return to work

4. If applicable, if further treatment has been recommended, and whether the employee has accepted this recommendation. (Any treatment after the employee has returned to work is voluntary).

5. Any work-related recommendations or adjustments that are deemed clinically appropriate

6. Date that the employee may return to work

The SEAP-CCO will not disclose information regarding specific diagnoses, medications, family history, or other similar information, as this information is not needed by the workplace.

If the SEAP-CCO discloses employee information, **the authorized recipients of the information are required to keep the information confidential, and are not permitted to _redisclose_ this information without the expressed written consent of the employee.** Those identified on the "Advance Notification Form" will be included on the consent forms signed by the employee. Therefore, if the supervisor receives confirmation that an employee has contacted SEAP and/or has been referred for treatment, the supervisor cannot share this information with anyone, including his or her supervisor. Further, this information should not be documented in any supervisory file or the employee's Official Personnel Folder. The SEAP Coordinator will maintain a copy of all written documentation from the SEAP-CCO regarding the IPE in a locked file cabinet. The SEAP Coordinator's records should be destroyed one year after the employee has been returned to work.

If at any point during the IPE process the employee believes that he/she needs a reasonable accommodation under the Americans With Disabilities Act (ADA), the employee will be directed back to the agency to request such an accommodation. The employee will be asked to sign additional written informed consent forms, so that information from the IPE evaluation process may be shared with the agency individual(s) responsible for making determinations on ADA requests.

IV. WORK TIME/LEAVE STATUS

1. If the employee does not contact the SEAP-CCO within the prescribed time

5

4/30/02

period or fails to attend the scheduled appointment(s), the SEAP-CCO will notify OA-SEAP and the agency. The agency should conduct an investigation and take appropriate administrative (disciplinary) action.

2. If the employee undergoes the IPE, the time period from the date the employee was directed to leave the workplace, until a determination has been made by SEAP on the employee's fitness for duty, will be treated as time worked.

*was Randy paid for this time?*

3. If SEAP determines that the employee is able to return to work, the employee, OA-SEAP and the agency will be notified. The time period from the date of that determination, up to the approved date of return set by the agency, will also be treated as time worked. The agency should notify the employee of the approved date of return.

4. If SEAP determines that the employee is not currently able to return to work, OA-SEAP and the agency will be notified. The agency will then immediately notify the employee that he/she is entitled to request the use of any approved paid or unpaid leave and also will provide the employee with appropriate enclosures from Management Directive 530.2, Sick Leave Without Pay, Parental Leave Without Pay and Family Care Leave Without Pay. Any requested and approved leave will be charged retroactively to the date the employee was advised by the agency of the need to request leave. If the employee fails to choose a form of unpaid or paid leave, he/she will be placed on AWOL status. The agency shall conduct an investigation and take appropriate administrative (disciplinary) action.

*[Management Directive 530.2]*

5. When SEAP determines that the employee has completed the required testing/treatment and is now able to return to work, the time period from the date that decision is communicated to the agency and employee, up to the approved date of return (set by the agency), will be treated as time worked.

6. If the employee requests additional time before returning to work after being certified to return, the employee must comply with the appropriate agency time and attendance policies and procedures.

| Direct order | Appointment(s) | Determination | Agency notification | Return to work |
|---|---|---|---|---|
| Time worked | | Employee leave | Time worked – unless additional leave is requested by employee | |

**The use of this protocol should be consistent with the guidance contained in the SEAP Supervisory Guide, including the information regarding confidentiality, preparing for the interview, conducting the interview, traps to avoid and post referral-follow through.**

6

ℰ-3

**THIS NOTICE DESCRIBES HOW MEDICAL INFORMATION ABOUT YOU MAY BE USED AND DISCLOSED AND HOW YOU CAN GET ACCESS TO THIS INFORMATION. PLEASE REVIEW IT CAREFULLY.**

## The Legal Duty of the Office of Administration's SEAP Office (OA-SEAP)

The OA-SEAP is required by applicable federal and state laws to maintain the privacy of your medical information and other personal information in its possession, otherwise known as "protected health information" ("PHI"). It is also required to give each employee who is covered by the State Employee Assistance Program (SEAP) this notice about OA-SEAP's privacy practices, its legal duties and your rights. You, and each of your family members who are eligible for SEAP, are also sometimes referred to herein as a "Client." OA-SEAP must follow the privacy practices that are described in this notice while it is in effect. This notice takes effect on April 14, 2003, and will remain in effect until it is replaced.

The OA-SEAP reserves the right to change its privacy practices, and the terms of this notice, at any time, according to applicable law. Before it makes a material change in its privacy practices, OA-SEAP will change its notice and send the new notice to all employees who are covered by SEAP. You may request a copy of the notice at any time. For more information about OA-SEAP's privacy practices, or to request an additional copy of this notice, please contact the OA-SEAP by using the information listed at the end of this notice.

## PHI

*"PHI" – Protected Health Information* is a subset of health information, including demographic information collected from an individual, that: 1) Is created or received by the OA-SEAP; and 2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and 3) Identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.

The OA-SEAP may receive PHI about you from various sources which may include your name, address, Social Security number, birth date, telephone number, health care provider, other health insurance coverage, and information about others in your household. It may also receive PHI about you from outside sources, such as employers, health care providers, federal and state agencies, or third-party vendors.

Except as described below, unless you specifically authorize us to do so, the OA-SEAP will provide access to your PHI only to you, your authorized representative, and those persons who need the information to aid the OA-SEAP in the conduct of its business ("our Business Associates"). You have the right to revoke an authorization, and how to do so is described in this notice.

When using or disclosing PHI, the OA-SEAP will make every reasonable effort to limit the use or disclosure of that information to the minimum extent necessary to accomplish the intended purpose. The OA-SEAP maintains physical, technical and procedural safeguards that comply with federal law and its Business Associates are limited by contract to using or disclosing PHI that OA-SEAP provides to them to only those purposes for which the information was disclosed.

## OA-SEAP Uses and Disclosures of PHI

The OA-SEAP is permitted to use and to disclose PHI in order to aid in your treatment, obtain payment for health care services provided to you and conduct its own "health care operations." Under limited circumstances, OA-SEAP may be able to provide PHI for the health care operations of other providers and health plans. It may use your PHI for purposes of treatment, payment and health care operations without your authorization. At times it will be necessary for the OA-SEAP to share PHI with its Business Associates so that they may assist OA-SEAP with its health care operations. Specific examples of the ways in which PHI may be used and disclosed are provided below. This list is representative only and not every use and disclosure in a category will be listed.

**Treatment:** Although the OA-SEAP does not engage in treatment activities, it may disclose your PHI to a doctor or a hospital which asks OA-SEAP for it to assist them in providing you with treatment.

**Payment:** The OA-SEAP may use and disclose your PHI to pay claims from doctors, hospitals and other providers for services delivered to you that are covered by SEAP.

- At the time of your hire the OA-SEAP receives PHI including your name, address, Social Security number and birth date, and this information is used by the OA-SEAP to provide coverage for SEAP benefits.

1



**Health Care Operations:** The OA-SEAP may use and disclose your PHI to engage in care coordination or case management, and to properly conduct its business.

- Appeals and Complaints: The OA-SEAP may use and disclose PHI to investigate a complaint or process an appeal by a Client. In order to do so, it may be necessary for OA-SEAP to gather information or documents, including medical records, that are held both internally and externally by the OA-SEAP or others.

- Billing: At the time of your hire OA-SEAP receives PHI such as name, address, Social Security number and birth date. The information may be used to reconcile billings OA-SEAP receives from its Business Associates, such as reimbursement for psychological evaluations and premium payments for services provided to you.

- Fraud and Abuse Detection and Compliance Programs: The OA-SEAP may use and disclose PHI for fraud and abuse detection and in activities required by its compliance program. It may also share this information with outside Health Oversight Agencies or other appropriate entities.

- Health Promotion and Disease Prevention: The OA-SEAP may use PHI to identify and contact you for population-based activities relating to improving health or reducing health care costs, such as information about disease management programs or about health-related benefits and services or about treatment alternatives that may be of interest to you. For example, it may contact you regarding participation in a disease management program or to recommend case management or certain preferred durable medical equipment vendors.

- Litigation or When Required by Law: In the event that you are involved in a lawsuit or other judicial proceeding, the OA-SEAP may use and disclose PHI in response to a court or administrative order as provided by law. For example, it may be required to disclose PHI in response to a subpoena, warrant or other lawful process.

- Quality Improvement: The OA-SEAP may use or disclose PHI to help it evaluate the performance of SEAP services.

- Research and Reporting: The OA-SEAP may use your PHI in order to conduct an analysis of its data. This information may be shared with OA-SEAP's Business Associates.

### Other Uses and Disclosures of PHI

**To You and with Your Authorization:** The OA-SEAP must disclose PHI to you, as described below in the Client's Rights section of this notice. You may, subject to the OA-SEAP's policy for Authorizations, give OA-SEAP written authorization to use PHI or to disclose your PHI to anyone for any purpose. You may revoke an Authorization in writing at any time; however, such revocation will not affect any use or disclosures that were made under the Authorization while it was in effect. For additional information regarding revocation, use the contact information found at the end of this notice. Without a written Authorization, the OA-SEAP may use or disclose PHI for any reason other than in the performance of treatment, payment, or health care operations, and except for those purposes described in this notice.

**Personal Representatives:** The OA-SEAP will treat your personal representative as if he/she were you for purposes of disclosing PHI. A "personal representative" is a parent of an unemancipated child, or a person who, as evidenced by a legal document according to state law, is designated to make medical decisions on behalf of an individual. Personal representatives include court-appointed guardians; persons appointed in "living wills" or medical directives; persons with powers of attorney; and/or executors/administrators of estates.

**Parents and Minors:** As a general rule, parents or other legal guardians (persons acting *in loco parentis*) have the right to access the PHI of an otherwise unemancipated minor child (defined by Pennsylvania law as a person under the age of twenty-one). However, Pennsylvania law allows a minor to obtain contraception, pregnancy testing and treatment, prenatal care, and testing and treatment for reportable diseases, sexually transmitted diseases, and HIV/AIDS without parental consent. Pennsylvania law also gives a minor the authority to control parental or other access to the PHI pertaining to such health care services. Therefore, a parent will need to obtain authorization from the minor before the OA-SEAP will release this type of information.

**Health Oversight Activities:** The OA-SEAP may share PHI as provided by law with Health Oversight Agencies, regulatory authorities or their appointed designees and reporting agencies. Examples of such "Health Oversight Agencies" include, but are not limited to, Centers for Medicare and Medicaid Services, the Pennsylvania Department of Health, Insurance Department, Attorney General, and the Auditor General.

2



**Business Associates:** The OA-SEAP works with many entities that perform a wide variety of services on its behalf. For example, it works with auditors, attorneys, actuaries, consultants, and other health care plans who act as third-party administrators for the OA-SEAP. OA-SEAP will ensure that appropriate agreements are in place to govern the permitted and required uses and disclosures of Client information by its Business Associates, to ensure OA-SEAP's Business Associates' compliance with state and federal privacy laws, and to ensure that its Business Associates will make reasonable efforts to safeguard the PHI they receive from it.

**To Individuals Involved in Your Care or Payment for Your Care:** OA-SEAP generally will not disclose PHI to your family members, close friends or others without your written authorization. However, under certain circumstances, the OA-SEAP may disclose PHI to such persons. For example, if you appear at the OA-SEAP office with your spouse and ask for PHI, OA-SEAP may ask you if it can provide you with your PHI in front of your spouse or even infer that it is permissible because you have brought your spouse with you. However, this verbal or implied authorization only applies to the particular disclosure and future disclosures of PHI to family members will require a new authorization, either written or verbal, depending on the circumstances.

OA-SEAP may also disclose PHI to your family members, close friends or others in cases of a medical emergency where you are unable to provide authorization. In such cases, the OA-SEAP will disclose PHI if it determines, using its professional judgment, that the disclosure would be in your best interest. In such cases, OA-SEAP will disclose only the PHI that is directly relevant to the person's involvement with your health care.

**Public Health and Communicable Disease Reporting:** The OA-SEAP may disclose your PHI to a public health authority who is permitted by law to collect or receive the information. OA-SEAP reporting may be made in order to prevent or control disease, injury or disability, report child abuse or neglect, notify a person who may have been exposed to a disease or may be at risk for contracting a disease or condition or notifying the appropriate government authority if it believes a Client has been the victim of abuse, neglect or domestic violence, to name a few.

**Required by Law:** The OA-SEAP may use or disclose your PHI when it is required or authorized to do so by law. For example, OA-SEAP must disclose your PHI to the U.S. Department of Health and Human Services if it asks to see it for purposes of determining whether OA-SEAP is in compliance with federal privacy laws. OA-SEAP may also disclose your PHI when authorized by Workers' Compensation or similar laws.

**To Law Enforcement and for Public Safety:** Under certain circumstances, OA-SEAP may disclose your PHI for law enforcement purposes. Examples of such situations are responding to court orders, warrants, or grand jury subpoenas; providing PHI in response to requests by law enforcement officials for identification and/or location of individuals; and responding to inquiries by law enforcement relating to victims of crime. In addition, under some circumstances, OA-SEAP may disclose your PHI in order to prevent or lessen a serious and imminent threat to the health or safety of a person or the public. This may include providing information to law enforcement authorities to apprehend a suspect or fugitive or advising an individual about threats made against them. The latter communications will be governed by Pennsylvania law. Finally, OA-SEAP may disclose your PHI if you are an inmate or other person in lawful custody and it is requested to do so by an appropriate law enforcement official or correctional institution.

**Military and National Security:** Under certain circumstances, the OA-SEAP may disclose the PHI of armed forces personnel to military authorities. It may also disclose PHI to authorized federal officials for lawful intelligence, counterintelligence, and other national security activities.

**Client Rights**

As a Client of the OA-SEAP, you have the following rights regarding your PHI:

- **Right to Inspect and Copy:** With limited exceptions, you have the right to inspect and/or obtain a copy of your PHI that the OA-SEAP maintains in a designated record set. You may request that OA-SEAP provide copies of your PHI to you in a format other than photocopies, such as CD or diskette. OA-SEAP will use the format you request unless it cannot practicably do so. You must make a request in writing to obtain access to your PHI. You may obtain a form to request access by using the contact information found at the end of this notice.

   If the designated record set is located on-site, the OA-SEAP will act upon your written request within 30 days after receipt. If the PHI is not maintained by, or accessible to, the OA-SEAP on-site, then it will respond to you no later than 60 days after receipt of the request. If these time frames cannot be met, OA-SEAP is entitled to a 30-day extension and you will be so notified. The OA-SEAP may charge you a reasonable cost-based fee to process and fulfill your request. If you prefer, you may request that OA-SEAP prepare a summary or an explanation of your PHI for a fee. If your request for access is denied, OA-SEAP will provide a written explanation for the denial and your rights regarding the denial.

3

The OA-SEAP does not receive or maintain a file of your behavioral health treatment records. You have a right to access these records through the treating physician, facility, or other provider that created and/or maintains the records. If you have difficulty accessing your treatment records through these sources, contact us using the information listed at the end of this notice and OA-SEAP will attempt to assist you.

- **Right to Amend:** You have the right to request that the OA-SEAP amend the PHI that it has created and that is maintained in its designated record set. Your request must be in writing, and it must explain why the information should be amended. You may obtain a form to request an amendment by using the contact information found at the end of this notice.

  OA-SEAP cannot amend demographic information, treatment records or any other information created by others. If you would like to amend the demographic information, please contact your human resource office or, to amend your treatment records, you must contact the treating physician, facility or other provider that created these records.

  The OA-SEAP will act on a request for an amendment within 60 days of receipt, or provide a written statement of the reason why it cannot do so and the date by which it will complete action on the request. If OA-SEAP accepts the amendment, it will advise you and make reasonable efforts to inform others, including people you name, of the amendment and to include the changes in any future disclosures of that information.

  The OA-SEAP may deny your request if: 1) it did not create the information you want amended; 2) the information is not part of the designated record set maintained by the OA-SEAP; 3) you do not have access rights to the information; or 4) it believes the information is accurate and complete. If OA-SEAP denies your request, it will provide a written explanation for the denial and your rights regarding the denial.

- **Right to an Accounting of Disclosures:** You have the right to receive an accounting of the instances in which the OA-SEAP or its Business Associates have disclosed your PHI. The accounting will review disclosures made over the past six years or back to April 14, 2003, whichever period is shorter. OA-SEAP will provide you with the date on which it made a disclosure, the name of the person or entity to which it disclosed your PHI, a description of the information it disclosed, the reason for the disclosure, and certain other information. Certain disclosures are excepted from this requirement (e.g., those made for treatment, payment or health care operations purposes or made in accordance with an Authorization) and will not appear on the accounting.

  Your request for an accounting must be made in writing. You may obtain a form to request an accounting by using the contact information found at the end of this notice. The OA-SEAP will act on your request within 60 days of receipt, or it will provide you with a written statement of the reasons for the delay and the date by which the accounting will be provided.

  If you request an accounting more than once in a 12-month period, OA-SEAP may charge you a reasonable, cost-based fee for responding to these additional requests. You will have the opportunity, in writing, to withdraw or modify your request for any subsequent accounting in order to avoid or reduce the fee. You may contact OA-SEAP using the information listed at the end of this notice for a full explanation of its fee structure.

- **Right to Request Restrictions:** You have the right to request that the OA-SEAP place additional restrictions on the use or disclosure of your PHI for treatment, payment, health care operations purposes, and for disclosures made to persons involved in your care. OA-SEAP is not required to agree to these additional restrictions and in some cases will be prohibited from agreeing to them, but if it does agree, it will abide by its agreement (except in an emergency). Generally, the OA-SEAP will not agree to requests for restrictions on uses and disclosures of PHI for treatment, payment or health care operations. It is necessary for OA-SEAP to use and disclose PHI for these purposes in order to provide the benefits that are afforded to you. If OA-SEAP does agree to a restriction, its agreement will always be in writing and signed by the Privacy Officer.

  Your request for restrictions must be in writing. You may obtain a form to request such restrictions, or additional information about your rights to request restrictions, by using the contact information found at the end of this notice.

- **Right to Request Confidential Communications:** You have the right to request that OA-SEAP communicate with you in confidence about your PHI by using "alternative means" or an "alternative location" if the disclosure of all or part of that information to another person could endanger you. OA-SEAP will accommodate such a request if it is reasonable and if the request specifies the alternative means or locations.

  To request confidential communication changes, you must make your request in writing, and you must clearly state that the information could endanger you if it is not communicated in confidence as you request. To obtain a form to request confidential communications, use the contact information found at the end of this notice.



### Right to Receive a Paper Copy of the Notice

If you receive this notice on OA-SEAP's web site or by electronic mail (e-mail), you are entitled to receive this notice in written form. Please contact OA-SEAP using the information listed at the end of this notice to obtain this notice in written form.

### Questions and Complaints

If you want more information about OA-SEAP's privacy practices or have questions or concerns, please contact OA-SEAP using the information listed at the end of this notice.

If you are concerned that OA-SEAP may have violated your privacy rights, or you disagree with a decision it made about access to your PHI or in response to a request you made to amend or restrict the use or disclosure of your information or to have OA-SEAP communicate with you in confidence by alternative means or at an alternative location, you must submit your complaint in writing. To obtain a form for submitting your complaint, use the contact information found at the end of this notice. You also may submit a written complaint to the U.S. Department of Health and Human Services (HHS). OA-SEAP will provide you with the address to file your complaint with the HHS upon request.

The OA-SEAP supports your right to protect the privacy of your PHI. It will not retaliate in any way if you choose to file a complaint with OA-SEAP or with the U.S. Department of Health and Human Services.

| | |
|---|---|
| Privacy Officer | Donna Hoskins-Helm<br>SEAP Program Director |
| Contact Office: | Office of Administration<br>Workplace Support Services Division<br>State Employee Assistance Program (SEAP) |
| Address: | 513 Finance Building<br>Harrisburg, PA 17120 |
| Phone | (717) 787-8575 |
| Fax | (717) 772-3153 |
| E-mail: | dhoskinshe@state.pa.us |

Court Name: Pennsylvania Middle
Division: 1
Receipt Number: 111003210
Cashier ID: pwarner
Transaction Date: 03/24/2008
Payer Name: JOHN KERR

CIVIL FILING FEE
  For: JOHN KERR
  Case/Party: D-PAM-1-08-CV-000538-001
  Amount:        $350.00

CHECK
  Check/Money Order Num: 1122
  Amt Tendered: $350.00

Total Due:       $350.00
Total Tendered: $350.00
Change Amt:       $0.00


Only when bank clears the check or
verifies credit of funds is the fee
or debt officially paid or
discharged. A fee of $45.00 will be
charged for returned checks.